**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ___ SEP 0 4 2015

_____
For CHIEF JUSTICE

This opinion was filed for record
at 3:55 pm on Sept. 4, 2015

_____
Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF WASHINGTON, a Washington nonprofit corporation; EL CENTRO DE LA RAZA, a Washington nonprofit corporation; WASHINGTON ASSOCIATION OF SCHOOL ADMINISTRATORS, a Washington nonprofit corporation; WASHINGTON EDUCATION ASSOCIATION, a Washington nonprofit corporation; WAYNE AU, PhD, on his own behalf; PAT BRAMAN, on her own behalf; DONNA BOYER, on her own behalf and on behalf of her minor children; and SARAH LUCAS, on her own behalf and on behalf of her minor children, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 89714-0 |
| Appellants, | ) ) | En Banc |
| v. | ) ) | |
| STATE OF WASHINGTON, | ) ) | |
| Respondent, | ) ) | |
| and | ) ) | |
| WASHINGTON STATE CHARTER SCHOOLS ASSOCIATION; LEAGUE OF EDUCATION VOTERS; DUCERE GROUP; CESAR CHAVEZ CHARTER SCHOOL; INITIATIVE 1240 SPONSOR TANIA DE SA CAMPOS; and MATT ELISARA, | ) ) ) ) ) ) ) | |
| Respondents/Intervenors. | ) ) ) | Filed  SEP 0 4 2015 |

MADSEN, C.J.—This case is a direct review of a King County Superior Court decision that found certain portions of Initiative 1240 (I-1240) (Charter School Act or Act), codified at chapter 28A.710 RCW, unconstitutional but left the remainder of the Act standing. We hold that the provisions of I-1240 that designate and treat charter schools as common schools violate article IX, section 2 of our state constitution and are void. This includes the Act's funding provisions, which attempt to tap into and shift a portion of moneys allocated for common schools to the new charter schools authorized by the Act. Because the provisions designating and funding charter schools as common schools are integral to the Act, such void provisions are not severable, and that determination is dispositive of the present case.

FACTS

In November 2012, Washington voters approved I-1240, codified in the Act, providing for the establishment of up to 40 charter schools within five years. Clerk's Papers (CP) at 39-78; RCW 28A.710.150(1). The Act was intended to provide parents with "more options" regarding the schooling of their children. RCW 28A.710.005(1)(f); *see also* RCW 28A.710.020(1) (new charter schools are public "common school[s] open to all children free of charge"). But the new schools came with a trade-off: the loss of local control and local accountability. Charter schools must provide a basic education, similar to traditional public schools, including instruction in the essential academic learning requirements, which are developed by the superintendent of public instruction.

2

*See* RCW 28A.710.040(2)(b); former RCW 28A.655.070(1)-(2) (2013). However, under the Act's provisions, charter schools "free teachers and principals from burdensome regulations that limit other public schools" thereby giving charter schools "the flexibility to innovate" regarding staffing and curriculum. RCW 28A.710.005(1)(g). Charter schools are exempt from many state rules. With the exception of "the specific state statutes and rules" identified in RCW 28A.710.040(2) and any "state statutes and rules made applicable to the charter school in the school's charter contract," charter schools are "not subject to and are exempt from all other state statutes and rules applicable to school districts and school district boards of directors . . . in areas such as scheduling, personnel, funding, and educational programs." RCW 28A.710.040(3).

Under the Act, charter schools are devoid of local control from their inception to their daily operation.[1] Charter schools can be approved in two ways. First, the Washington Charter School Commission, which is an "independent state agency" established by the Act and made up of nine appointed members, has the power to establish charter schools anywhere in the State. *See* RCW 28A.710.070(1)-(2), .080(1).[2] Second, school districts may apply to the Washington State Board of Education for permission to authorize charter schools. RCW 28A.710.080(2). The commission and approved school districts (referred to as "charter school authorizers") solicit charter applications, approve or deny applications, and negotiate and execute charter contracts.

---

[1] Charter schools are formed upon the application of a nonsectarian, nonprofit corporation, *see* RCW 28A.710.010(1), .040(4), and are governed by an appointed charter school board. RCW 28A.170.010(6), .020(3).

[2] All commission members must have a "commitment to charter schooling as a strategy for strengthening public education." RCW 28A.710.070(3).

3

No. 89714-0

RCW 28A.710.100(1). Charter school authorizers also monitor performance and legal compliance of charter schools, RCW 28A.710.180(1), but such oversight cannot "unduly inhibit the autonomy granted to charter schools," RCW 28A.710.180(2), and such oversight must also be consistent with the principles and standards developed by another private organization, the National Association of Charter School Authorizers. RCW 28A.710.100(3).[3]

As for daily operation, charter schools are not governed by elected local school boards. Instead, charter schools are operated by a "charter school board," RCW 28A.710.020(3), which is "appointed or selected under the terms of a charter application to manage and operate the charter school." RCW 28A.710.010(6). The board is responsible for functions typically handled by an elected school board, including hiring, managing, and discharging employees; receiving and disbursing funds; entering contracts; and determining enrollment numbers. RCW 28A.710.030(1), .050(5).

As for funding, the Act requires the superintendent to apportion funds to charter schools on the same basis as public school districts. *See* RCW 28A.710.220, .230(1). Such disbursements include basic education moneys appropriated by the legislature in the biennial operating budget for the use of common schools and moneys from the common school construction fund. *See* RCW 28A.710.220(2), .230(1); RCW 28A.150.380(1), .250(1).

---

[3] The commission has authorized seven charter schools. Spokane Public Schools, a school district authorizer, has authorized one charter school.

4

Alarmed over the lack of local accountability and fiscal impacts of the Act, appellants[4] sued the State of Washington in King County Superior Court, seeking a declaratory judgment that the Act is unconstitutional.[5] Several supporters of charter schools intervened.[6] All three parties moved for summary judgment, and the trial court granted summary judgment to the State and intervenors on all issues but one. The trial court held that charter schools are not "common schools" under article IX of Washington's Constitution and, therefore, the common school construction fund could not be appropriated to charter schools. CP at 1043, 1045. The trial court found, however, that the provisions permitting such appropriations were severable. The trial court concluded that the Act was otherwise constitutional. All parties sought direct review, which we granted.

## ANALYSIS

We begin by noting what this case is not about. Our inquiry is not concerned with the merits or demerits of charter schools. Whether charter schools would enhance our state's public school system or appropriately address perceived shortcomings of that

---

[4]The plaintiffs/appellants consist of several organizations and community members: the League of Women Voters of Washington; El Centro De Le Raza; Washington Association of School Administrators; Washington Education Association; Wayne Au, PhD; Pat Braman; Donna Boyer; and Sarah Lucas.

[5] Appellants argued that the Act violates article II, section 37; article III, section 22; article VII, section 2(a); and article IX, sections 1, 2, and 3 of the Washington Constitution.

[6]Intervenors/respondents consist of the Washington State Charter Schools Association, League of Education Voters, Ducere Group, Cesar Chavez Charter School, I-1240 sponsor Tania De Sa Campos, and Matt Elisara.

system are issues for the legislature and the voters.[7] The issue for this court is what are the requirements of the constitution. *Cf. Gerberding v. Munro*, 134 Wn.2d 188, 211, 949 P.2d 1366 (1998) ("we are not swayed in our analysis of [the term limits initiative] by the policy merits or demerits of term limits for officeholders"). Accordingly, "[o]ur review here is limited to the issue of whether the voters acted in compliance with our state's constitution in expressing their collective will." *Id.* "[W]hile initiative measures are reflective of the reserved power of the people to legislate, the people in their legislative capacity remain subject to the mandates of the Constitution." *Id.* at 196 (citation omitted). Moreover, we have made clear that the initiative process is limited in scope to subject matter that is legislative in nature, that an initiative attempting to achieve something not within its power is invalid, and that the initiative power may not be used to amend the constitution. *Id.* at 210 n.11.

*Charter Schools Are Not Common Schools*

This case turns on the language of article IX, section 2 of our state constitution and this court's case law addressing that provision. *See Tunstall v. Bergeson*, 141 Wn.2d 201, 220-21, 5 P.3d 691 (2000) ("the court's focus when addressing constitutional facial challenges is on whether the statute's language violates the constitution"). Article IX, section 2 of the Washington Constitution provides:

> The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such

---

[7] Amici largely address the perceived benefits of charter schools and their successes in other states. *See, e.g.*, Br. of Amicus Pac. Legal Found. at 13-20; Br. of Amici Nat'l All. for Pub. Charter Sch., Black All. for Educ. Options, and the Nat'l Ctr. for Special Educ. in Charter Schools at 3-5; Br. of Amici First Place Scholars Charter Sch. et al. at 12-20.

high schools, normal schools, and technical schools as may hereafter be established. But the entire revenue derived from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools.[8]

In order to tap the funding sources identified in article IX, I-1240 declared charter schools to be "common schools." *See* LAWS OF 2013, ch. 2, §§ 101(1)(m), (n)(vii), 202(1), (2), 208(1), 301, 302; *see also* RCW 28A.710.005(1)(m), (n)(vii), .020(1), (2), .070(1); RCW 28A.150.010; RCW 28A.315.005. The Act also directed that charter schools are to be funded "as other public schools," and defined "[p]ublic schools" to mean "the common schools as referred to in article IX of the state constitution, including charter schools," and other schools below the college level and maintained at public expense. LAWS OF 2013, ch. 2, §§ 222(1), 301; *see also id.* § 101(1)(n)(vii); RCW 28A.710.220(1), .005(1)(n)(vii); RCW 28A.150.010. Charter schools must report student enrollment and comply with applicable reporting requirements to receive state or federal funding. LAWS OF 2013, ch. 2, § 222(1); RCW 28A.710.220(1). The Act directs the superintendent of public instruction to allocate funding for charter schools "based on the same funding criteria used for noncharter public schools," and charter schools are

---

[8] Article IX, section 1 provides:

It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex.

Article IX, section 3 provides in relevant part:

There is hereby established the common school construction fund to be used exclusively for the purpose of financing the construction of facilities for the common schools.

7

"eligible to apply for student grants on the same basis as a school district." LAWS OF 2013, ch. 2, § 222(2); RCW 28A.710.220(2). The Act provides that charter schools "shall be included in the levy planning, budgets, and funding distribution in the same manner as other public schools in the district," that school districts "must allocate levy moneys to a conversion charter school," and that charter schools "must be included in levy planning, budgets, and funding distribution in the same manner as other public schools." LAWS OF 2013, ch. 2, § 222(5), (6), (8); RCW 28A.710.220(5), (6), (8). The Act additionally declares that charter schools are "eligible for state matching funds for common school construction." LAWS OF 2013, ch. 2, § 223(1); RCW 28A.710.230(1).

Moreover, I-1240's voter's pamphlet made clear to voters that the fiscal impact of the initiative was merely to shift existing school funding from existing (common) schools to charter schools. "Initiative 1240 is anticipated to shift revenues, expenditures and costs between local public school districts or from local public school districts to charter schools, primarily from movement in student enrollment." CP at 549. "Charter schools would be tuition-free public schools within the state system of common schools." *Id.* at 550. "State funding for charter schools would be provided in the same manner as other public schools [and] . . . based on the same funding criteria used for noncharter schools." *Id.* "Charter schools provide another enrollment option, but they do not change current law that state funding follows the student." *Id.* "Charter schools are eligible for state matching funds for common school construction." *Id.*

Relevant here, I-1240 also provides that charter schools are "governed by a charter school board," which is "appointed or selected . . . to manage and operate the charter school." LAWS OF 2013, ch. 2, § 201(5)-(6); RCW 28A.710.010(5)-(6). The charter school board has the power to hire and discharge charter school employees and may contract with nonprofit organizations to manage the charter school. LAWS OF 2013, ch. 2, § 203(1)(a),(c); RCW 28A.710.030(1)(a), (c); *see also* LAWS OF 2013, ch. 2, § 101(2); RCW 28A.710.005(2) ("the people enact this initiative measure to authorize . . . charter schools in the state of Washington[] to be operated by qualified nonprofit organizations"). I-1240 also makes charter schools "free from many regulations" that govern other schools. LAWS OF 2013, ch. 2, § 101(1)(n)(viii); RCW 28A.710.005(1)(n)(viii). Charter schools are "exempt from all school district policies," as well as "all . . . state statutes and rules applicable to school districts" except those listed in I-1240 section 204(2) and those made applicable in the school's charter contract. LAWS OF 2013, ch. 2, § 204(3); RCW 28A.710.040(3).

This case addresses the designation, funding, and control of charter schools as set forth in I-1240 and that initiative's compliance with article IX, section 2. Accordingly, the case is largely determined by our prior decision in *School District No. 20 v. Bryan*, 51 Wash. 498, 99 P. 28 (1909). Intervenors ask us to "overturn *Bryan*," Answering Br. & Opening Cross-Appeal Br. of Intervenors at 48, but we decline to do so. *Bryan* has been the law in Washington for more than a hundred years and is repeatedly relied on as

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

authority by Washington's appellate courts.[9] Intervenors offer no compelling reason to abandon *Bryan*. Similarly, the State asks us to "recognize an evolving common school system" and not read *Bryan* as "a static statement of constitutional imperatives." Br. of Resp't/Cross-Appellant State of Wash. at 26, 23. But in *Bryan* this court established the criteria for evaluating a "common school" within the meaning of article IX, and warned, "The words 'common school' must measure up to every requirement of the constitution . . . and whenever by any subterfuge it is sought to qualify or enlarge their meaning beyond the intent and spirit of the constitution, the attempt must fail." 51 Wash. at 503. *Bryan* established the rule that

> a common school, within the meaning of our constitution, is one that is common to all children of proper age and capacity, free, and subject to and under the control of the qualified voters of the school district. The complete control of the schools is a most important feature, for it carries with it the right of the voters, through their chosen agents, to select qualified teachers, with powers to discharge them if they are incompetent.

---

[9] *See, e.g., State v. Preston*, 79 Wash. 286, 288-89, 140 P. 350 (1914) (applying *Bryan*'s definition of "common schools"); *State ex rel. State Bd. for Vocational Educ. v. Yelle,* 199 Wash. 312, 314, 91 P.2d 573 (1939) (citing *Bryan* as authority concerning appropriate use of common school funds); *State ex rel. City of Seattle v. Seattle Elec. Co.*, 71 Wash. 213, 215, 128 P. 220 (1912) (acknowledging *Bryan* as relevant to the issue of "measuring the limit of legislative power by reference to the constitution"); *Tunstall*, 141 Wn.2d at 221 (citing *Bryan* regarding uniformity); *Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 524, 219 P.3d 941 (2009) (quoting *Bryan* regarding uniformity definition); *Sch. Dists.' All. for Adequate Funding of Special Educ. v. State*, 149 Wn. App. 241, 263, 202 P.3d 990 (2009) (citing *Bryan* regarding uniformity definition), *aff'd*, 170 Wn.2d 599, 244 P.3d 1 (2010).

*Id.* at 504. Here, because charter schools under I-1240 are run by an appointed board or nonprofit organization and thus are not subject to local voter control, they cannot qualify as "common schools" within the meaning of article IX.[10]

### The Charter School Act's Funding Provisions Fail

As *Bryan* noted, when adopting our constitution the people of this state "endeavored to protect and preserve the funds set apart by law for the support of the common school from invasion, so that they might be applied exclusively to . . . such schools." *Id.* at 502. As discussed above, charter schools do not qualify as common schools. As explained below, by diverting common school funds to charter schools, the Act contravenes article IX, section 2 of the Washington Constitution. *Id.* at 501, 507.[11]

---

[10] Further, under *Bryan* the absence of local control by voters would also violate the article IX uniformity requirement. *Bryan* explained,

> The system must be uniform in that every child shall have the same advantages and be subject to the same discipline as every other child. A system of control through school boards and county superintendents is provided for, their duties defined, and a method supplied to secure, in theory at least, efficient teachers and instructors.

51 Wash. at 502-03. *Bryan* held in part that the legislation in question was invalid because "its operation . . . would break the uniformity of the common school system," that is, by having students instructed by uncertified teachers. *Id.* at 504. Here, the uniformity of the common school system is similarly broken in that the Charter School Act eliminates the local voter control that is a hallmark of common schools, thereby resulting in different (nonuniform) governance for charter schools as compared to common schools.

Aside from the above observation—that the Act's governance provisions for charter schools violate the "uniform system" requirement of article IX, section 2—we do not further address the Act's article IX uniformity failings or the parties' other arguments because we find the invalidity of the Act's funding provisions as discussed herein to be dispositive.

[11] "'To say that the Legislature can determine what institutions shall receive the proceeds of the school fund, and that whatever they determine to be entitled thereto becomes *ipso facto* a common school, is begging the whole question, and annulling the constitutional restriction.'" *Id.* at 504-05 (quoting *People ex rel. Roman Catholic Orphan Asylum Soc'y v. Bd. of Educ.*, 13 Barb. 400 (N.Y. Sup. Gen. Term 1851).

11

No. 89714-0

Our constitution requires the legislature to dedicate state funds to support "common schools." WASH. CONST. art. IX, §§ 2, 3. As noted, section 2 provides that "the entire revenue derived from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools." *Id.* Section 3 establishes a separate construction fund for the sole use of the common schools. Using *any* of those funds for purposes other than to support common schools is unconstitutional. *Mitchell v. Consol. Sch. Dist. No. 201*, 17 Wn.2d 61, 66, 135 P.2d 79 (1943) (plurality opinion). This court has repeatedly struck down laws diverting common school funds to any other purpose. *See, e.g., Leonard v. City of Spokane*, 127 Wn.2d 194, 199, 897 P.2d 358 (1995) (public improvements); *Mitchell*, 17 Wn.2d at 65-66 (transportation to private schools); *State ex rel. State Bd. for Vocational Educ. v. Yelle,* 199 Wash. 312, 316-17, 91 P.2d 573 (1939) (vocational rehabilitation); *Sheldon v. Purdy*, 17 Wash. 135, 141, 49 P. 228 (1897) (interest on school district bonds); *Bryan*, 51 Wash. at 505 (schools attached to teacher training colleges); *State v. Preston*, 79 Wash. 286, 288-89, 140 P. 350 (1914) (same).

Under the Act, money that is dedicated to common schools is unconstitutionally diverted to charter schools. As noted, the Act provides that charter schools are to be funded on the same basis as common schools. The superintendent must distribute money from the constitutionally restricted basic education allocation to charter schools on the same basis as common schools. *See* RCW 28A.710.220(2).[12] In other words, under the

---

[12] A portion of the basic education allocation is derived from the state levy on real property designated for support of common schools. *See* RCW 84.52.065.

12

terms of the Act's provisions the source of funds for the operation of charter schools is the basic education moneys that are otherwise dedicated to the operation of common schools. *See* RCW 28A.510.250; RCW 28A.710.220(2); RCW 84.52.065,[13] .067.

However, the constitution sets aside certain property and other moneys to establish a permanent fund for the exclusive use of common schools, referred to in article IX as the "common school fund." WASH. CONST. art. IX, §§ 2, 3. Article IX, section 2 also extended constitutional protection to any "state tax for common schools." In *Yelle*, 199 Wash. at 316, this court addressed the restrictions on the use of basic education funds allocated to common schools. *Yelle* struck down a law that would have diverted tax revenues allocated to the common schools to support a vocational rehabilitation program operated by a state board. *Id.* This court explained that it was "beside the question" that the vast majority of state funding in place at that time, whether derived from tax revenues or "cash on hand," could have been allocated to other purposes in the first instance. *Id.* The constitutional protection afforded to common school appropriations is not dependent on the source of the revenue (i.e., the type of tax or other funding source) or the account

---

[13] After the October 28, 2014 oral argument in this case, the State filed a statement of additional authority on July 22, 2015 citing Laws of 2015, chapter 4, section 516(5) as supporting the notion that "charter schools can operate without access to constitutionally restricted revenue." Statement of Additional Auth. at 1-2. Section 516(5) is a subsection of the operating budget regarding funding for the 2015-2017 biennium, and provides, "State general fund appropriations distributed through Part V of this act for the operation and administration of charter schools as provided in chapter 28A.710 RCW shall not include state common school levy revenues collected under RCW 84.52.065." LAWS OF 2015, ch. 4, § 516(5). This legislation, which is expressly effective on June 30, 2015 and is prospective in its application, does not alter our analysis or conclusion concerning the effect of the Act as previously passed by the voters in 2012 and codified in 2013. The validity of section 516(5) as a substantive law provision buried within an operating budget is not before us. For present purposes it is enough to note that section 516(5) does not assist the State.

in which the funds are held (i.e., the general fund or other state fund). Rather, this court held that all money "allocated to the support of the common schools . . . constitute[s] a 'state tax for the common schools' in contemplation of Art. IX, § 2, of the constitution." *Id. Yelle* continued, "[O]nce appropriated to the support of the common schools," funds cannot "subsequently be diverted to other purposes." *Id.* at 317. This court cautioned that to hold otherwise "would be calamitous." *Id.*

Similarly, in *Mitchell* this court explained that the use of *any* common school funds for other than a common school purpose violates the constitution. There, this court held unconstitutional a statute that extended school bus transportation privileges to private school students along already existing and operating public school bus routes. This court rejected the argument that the statute did not impose any additional expense on the school district in that the private school students would merely join the public school students on the school bus's established and regular route. *Mitchell*, 17 Wn.2d at 66. Although the statute in question did not identify or make any appropriation for carrying out its purpose, because its operation would have the effect of utilizing common school funds for other than common school purposes, it contravened article IX, section 2's exclusivity requirement. *Id.* Restated, the statute's overall fiscal neutrality did not affect its constitutional infirmity. Also, even though the statute did not address funding, the fact that it's intended operation would "necessitate[] the use of common school funds for other than common school purposes" rendered it unconstitutional. *Id.*

14

Under the Act, charter schools receive funds from the legislature's basic education allocation for the common schools. *See* RCW 28A.710.220(2). By statute, all of the basic education funds in the biennial operations budget are designated for the exclusive use of the common schools. RCW 28A.150.380(1) ("The state legislature shall, at each regular session in an odd-numbered year, appropriate for the current use of the common schools such amounts as needed for state support to school districts during the ensuing biennium for the program of basic education under RCW 28A.150.200."). These funds "made available by the legislature for the current use of the common schools" are then distributed annually by the Superintendent to "each school district of the state operating a basic education instructional program." RCW 28A.150.250(1). That the specific common school property levy is only a portion of the state funds used to support common schools does not alter the protection afforded to the entire basic education allocation as a "'state tax for common schools'" within the meaning of article IX, section 2. *Yelle*, 199 Wn.2d at 316-17 (quoting CONST. art. IX, § 2). The Act unconstitutionally reallocates these restricted funds to charter schools, which do not qualify as common schools.

Compounding this problem, the State does not segregate constitutionally restricted moneys from other state funds. Nor can it demonstrate that these restricted moneys are protected from being spent on charter schools. *Cf. id.* at 317; *Leonard*, 127 Wn.2d at 199 (act violated article IX, section 2 because it diverted revenues that under the existing statutory scheme would otherwise be used to support the common schools). Given this absence of segregation and accountability, we find unconvincing the State's view that

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

charter schools may be constitutionally funded through the general fund. *See* Br. of Resp't/Cross-Appellant State of Wash. at 30-31. Historically, the state common school funds were maintained in a separate public school account and distributed to the common schools by the Superintendent. *See, e.g., Yelle*, 199 Wash. at 314-15. While some other constitutionally restricted state funds continue to be maintained in separate accounts (e.g., common school construction fund (WASH. CONST. art. IX, § 3), gas taxes for transportation purposes (WASH. CONST. art. II, § 40)), since at least 1967, the constitutionally restricted common school property levy revenues have been deposited in the State's "general fund," which is used for the basic education allocation. *See* RCW 84.52.067; LAWS OF 1967, Ex. Sess., ch. 133, § 2. There is no way to track the restricted common school funds or to ensure that these dollars are used exclusively to support the common schools.

In addition to the diversion of basic education funds, the Act diverts funds from the common school construction fund established under article IX, section 3. *See* RCW 28A.710.230(1). The school construction fund, unlike other restricted common school funds, continues to be held in a segregated account. *See* RCW 28A.515.320. The trial court correctly held that the Charter School Act's provisions authorizing diversion of these restricted funds are unconstitutional.

Our constitution directs the legislature to establish and fund common schools and restricts the legislature's power to divert funds committed to common schools for other purposes even if related to education. CONST. art. IX, §§ 1-3. The Charter School Act's

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

diversion of basic education funds allocated to the support of the common schools and common school construction funds is unconstitutional and void.

We also disagree with the State's view that the Act's remaining provisions are saved because funding "follows the student" and in any event charter schools could be funded out of the state general fund. Br. of Resp't/Cross-Appellant State of Wash. at 40. The fact that public school money distributions are generally based on per capita student attendance does not mean that common school funds are available for students who do not attend common schools. Where a child is not attending a common school, there can be no entitlement to "an apportionment of the current state school fund, to a credit predicated on attendance of children at such . . . school." *State v. Preston*, 79 Wash. 286, 289, 140 P. 350 (1914).

Similarly, in *Bryan*, the legislative act in question provided for a model training school department to be established in the state normal schools, under the supervision of the board of trustees of such normal schools. Relevant here, the legislation directed the superintendent of public instruction to apportion moneys "'out of the funds available for the support of the common schools'" in an amount reflecting "'the number of pupils in attendance'" at the model training school and distribute such portion to the noted boards. *Bryan*, 51 Wash. at 500-01 (quoting LAWS OF 1907, ch. 97, § 4). In other words, under the legislation in question the money would follow the student. This court affirmed the trial court's ruling that such legislation "'which seeks to apportion or appropriate any part

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 89714-0

of the common school fund or revenue therefrom or state tax for the support of the common schools is unconstitutional and void.'" *Id.* at 501.

Further, as discussed above, the Act designates and relies on common school funds as its funding source. Without those funds, the Act cannot function as intended. Notably, I-1240 supporters' statements in the voters' pamphlet assured voters that charter schools would be funded out of the current school system by merely shifting existing school funding. In response to criticism that I-1240 "diverts taxpayer money into unaccountable . . . charter schools [and] . . . will drain millions of dollars from existing classrooms," CP at 553, supporters stated in the pamphlet that "[c]harter schools *are* public schools, open to *all* students, accountable to a local school board or state commission, and do not take a penny from our public school system or students. They're funded based on student enrollment just like other public schools." *Id.* at 553.

*The Act's Invalid Provisions Are Not Severable*

The next question is whether the above noted unconstitutional provisions render the Act unconstitutional in its entirety. "A legislative act is not unconstitutional in its entirety unless invalid provisions are unseverable." *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 227, 11 P.3d 762, 27 P.3d 608 (2000). The test for severability is whether the unconstitutional provisions are so connected to the remaining provisions that it cannot be reasonably believed that the legislative body would have passed the remainder of the act's provisions without the invalid portions, or unless elimination of the invalid part would render the remaining part useless to accomplish the

18

legislative purposes. *Id.* at 227-28; *Gerberding v. Munro*, 134 Wn.2d 188, 197, 949 P.2d 1366 (1998); *State v. Crediford*, 130 Wn.2d 747, 760, 927 P.2d 1129 (1996). While the presence of a severability clause may provide assurance that the legislative body would have enacted remaining sections without the invalid portions, a severability clause is not necessarily dispositive on the question of whether the legislative body would have enacted the remainder of the act. *Amalgamated*, 142 Wn.2d at 228. Here, the Act contains a severability clause, but the invalid provisions are so intertwined with the remainder of the Act and so fundamental to the Act's efficacy that under either of the above tests the invalid portions are not severable.

The Act identifies charter schools as common schools and is expressly reliant on common school funding to support such charter schools. That a funding source is required for the existence of charter schools is self-evident. As discussed above, the Act specifically intends to use common school funding allocations as that source. Without a valid funding source the charter schools envisioned in I-1240 are not viable. Moreover, I-1240's voters' pamphlet stressed that the funding for charter schools will come from existing funding sources in the form of a "shift [in] revenues" from "local public school districts to charter schools." CP at 549. In sum, without funding, charter schools are not viable. Nor can it be believed that voters would have approved the Charter School Act without its funding mechanism. *See Leonard*, 127 Wn.2d at 202 (act's funding mechanism is its "heart and soul" and act would be "virtually worthless" without it; thus, the funding mechanism is not severable from the remainder of the act).

19

No. 89714-0

In sum, the Charter School Act violates article IX, section 2 because charter schools are not common schools despite the Act's attempt to so designate them. The Act's designated funding mechanisms fail, and these provisions are not severable from the remainder of the Charter School Act.[14]

## CONCLUSION

The portions of I-1240 designating charter schools as common schools violate article IX, section 2 of the Washington Constitution and are invalid. For the same reason, the portions of I-1240 providing access to restricted common school funding are also invalid. These provisions are not severable and render the entire Act unconstitutional. We affirm in part and reverse in part and remand for an appropriate order.

---

[14] Because these determinations are dispositive of this case, we do not address the parties' other arguments. *See Bryan*, 51 Wash. at 506-07; *Gerberding*, 134 Wn.2d at 211 n.12.

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

_Madsen, C.J._

WE CONCUR:

_Johnson, J._                    _Wiggins, J._

_Owens, J._

_Stephens, J._                    _Gordon McCloud, J._

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 89714-0

FAIRHURST, J. (concurring in part and dissenting in part)—We must decide whether newly created charter schools are "common schools" as defined by article IX, section 2 of the Washington Constitution and, if not, whether the charter schools act (Act), codified at chapter 28A.710 RCW, requires the State to support charter schools with funds that are constitutionally restricted to the benefit of common schools. I agree that charter schools are not common schools. But because nothing in the Act expressly requires the use of restricted funds, the Act is facially valid. Since charter schools may be constitutionally funded with unrestricted monies from the general fund, I concur in part and dissent in part.

In November 2012, Washington voters approved Initiative 1240 (I-1240), codified in the Act, allowing up to 40 charter schools to open within five years. The Act was intended to provide parents with "more options to find the best learning environment for their children." RCW 28A.710.005(1)(f). Under the Act, charter schools would be operated by nonprofit, nonsectarian organizations. RCW 28A.710.010(1), .040(4). Further, charter schools must be free and open to all

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

students. RCW 28A.710.020(1). If student interest exceeds capacity, spaces are allotted by lottery. RCW 28A.710.050(4).

While charter schools are given more "flexibility to innovate and make decisions about staffing, curriculum, and learning opportunities to improve student achievement and outcomes," they are still subject to various restrictions. RCW 28A.710.005(1)(g). For example, all teachers must be state certificated. RCW 28A.710.040(2)(c). Like traditional public schools, charter schools are required to provide a basic education through instruction in the essential academic learning requirements (EALRs). RCW 28A.710.040(2)(b). EALRs are developed by the superintendent of public instruction (Superintendent) and prescribe the substantive content taught to all of Washington's public school students, often spanning several hundred pages per subject. Charter schools are also subject to performance improvement goals advanced by the state Board of Education. RCW 28A.710.040(2)(g).

When it comes to evaluating performance, charter schools are assessed under the same statewide student assessment system developed and overseen by the Superintendent. RCW 28A.710.040(2)(b). Charter schools are additionally required to provide annual performance reports to the parents and the community served by the school. RCW 28A.710.040(2)(f) (citing RCW 28A.655.110). If a charter school

*League of Women Voters v. State*, No. 89714-0
Fairhurst, J. (concurring in part and dissenting in part)

falls to the bottom 25 percent of the statewide school accountability index, that charter school's contract will not be renewed. RCW 28A.710.200(2).

Funding for a charter school is tied to student enrollment, and the Superintendent allocates funding to charter schools using the same formulas that are applied to traditional public schools. RCW 28A.710.220(2). The State's general fund is the main source of funding for public education, including charter schools. *See* LAWS OF 2013, 2d Spec. Sess., ch. 4, §§ 501-516 (operational expenses for education).

A.    Common schools can and must function without using constitutionally restricted funds

Washington's constitution identifies three funds whose use is restricted solely for the benefit of common schools. The Act does not require the use of monies from any of these funds. The current funding scheme for charter schools and public education is consistent with our constitution and precedent. The appellants,[1] making a facial challenge, fail to meet their burden.

1.    *The Act does not divert resources from any of the three restricted funds*

Sections 2 and 3 of article IX identify three protected funds: the permanent common school fund, the state tax for common schools, and the common school

---

[1]The plaintiffs/appellants consist of several nonprofit organizations and community members: the League of Women Voters of Washington; El Centro De Le Raza; Washington Association of School Administrators; Washington Education Association; Wayne Au, PhD; Pat Braman; Donna Boyer; and Sarah Lucas (hereinafter collectively appellants).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

construction fund. The legislature cannot use revenue from any of these restricted funds for purposes other than to support common schools. *Mitchell v. Consol. Sch. Dist. No. 201*, 17 Wn.2d 61, 66, 135 P.2d 79 (1943) (plurality opinion).

First, the permanent common school fund was created by article IX, section 3 in 1889. There are two components of the permanent common school fund that we must consider—the principal of the fund and the interest that accrues on the fund.

In 1967, the legislature froze the principal of the permanent common school fund. LAWS OF 1967, ch. 29, § 1, at 98. To this day, our constitution requires that the principal of the fund must remain intact. CONST. art. IX, § 3; RCW 28A.515.300(2). The Act does not direct the legislature to expend any principal, nor do appellants allege that the principal of the fund has been improperly appropriated.

Neither has the interest been diverted to the support of charter schools. When the fund was created in 1889, our constitution provided that "interest accruing on [the permanent common school fund,] . . . shall be exclusively applied to the current use of the common schools." CONST. art. IX, § 3 (1889). However, when the legislature froze the principal of the fund in 1967, it directed all of the interest accruing on the fund toward the newly created common school construction fund, which was dedicated solely to common school construction. CONST. art. IX, § 3. Thus, the interest from the permanent common school fund is not and cannot be used for *any* school operating costs. Appellants therefore cannot show that any money

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from the permanent common school fund is being diverted to support charter schools.

Second, the state tax for common schools, codified in RCW 84.52.065, levies "for the support of common schools of the state a tax of three dollars and sixty cents per thousand dollars." Currently, revenue from the state tax for common schools is placed into the general fund, RCW 84.52.067, from which our public education system receives support, LAWS OF 2013, 2d Spec. Sess., ch. 4, §§ 501-516. As discussed in more detail below, the state tax for common schools constitutes only a fraction of the total appropriation to our public schools. For example, in fiscal year 2015, the appropriation for public education amounted to roughly $7.095 billion from the general fund. LAWS OF 2013, 2d Spec. Sess., ch. 4, §§ 502, 505, 507, 510-511, 514-515. Of this, only $2.003 billion consists of the state tax for common schools. WASH. STATE ECON. & REVENUE FORECAST COUNCIL, WASHINGTON STATE ECONOMIC AND REVENUE FORECAST 69 (2014), http://www.erfc.wa.gov/publications/documents/sep14pub.pdf. Thus, only 28 percent of the revenue appropriated for public education from the general fund is restricted. Because charter schools account for merely 2 percent of Washington's public schools, they can certainly be funded through the remaining 72 percent of the appropriation from the general fund. Importantly, nowhere does the Act expressly require the State to fund charter schools with revenue from the state tax for common schools.

5

Finally, article IX, section 3 created the third restricted fund when it "established the common school construction fund to be used exclusively for the purpose of financing the construction of facilities for the common schools." The text of the Act does not actually require the State to provide such funding from the common school construction fund. The Act simply provides that "[c]harter schools are eligible for state matching funds for common school construction." RCW 28A.710.230(1). A review of the 2013 session laws reveals that the legislature funds school construction from both the state building construction account and the common school construction account. *See* LAWS OF 2013, ch. 19, §§ 5001-5030, at 2734-43. In fact, the majority of public school construction is funded by the state building construction account. *Id.* Thus, while the legislature may not appropriate from the common school construction fund for construction or repair of charter schools, nothing would prevent it from using the state building construction account or even unrestricted revenues in the general fund. Appellants fail to establish that the Act will divert any revenue from the common school construction fund.

Contrary to the majority's view, the Act does not expressly require the use of any of the three restricted funds. The majority points to RCW 28A.710.220(2). Majority at 12-13. That statute provides that "[c]ategorical funding must be allocated to a charter school based on the same funding criteria used for noncharter public

schools."[2] On its face, this statute does not require the State to support charter schools with restricted funds. Taken in context, this provision relates to the *amount* of money that a charter school may receive and requires that charter schools be subject to the same per-pupil formula as other public schools. It plainly says nothing about the *source* of funding. In fact, nowhere does the Act identify a source of funding, it merely states that charter schools must "receive funding based on student enrollment just like existing public schools." RCW 28A.710.005(1)(n)(vii). Because the Act neither identifies a source of funding nor commands the use of restricted funds to support charter schools, it withstands appellants' facial challenge and is constitutional.[3]

---

[2]The full text of RCW 28A.710.220(2) states:

According to the schedule established under RCW 28A.510.250, the superintendent of public instruction shall allocate funding for a charter school including general apportionment, special education, categorical, and other nonbasic education moneys. Allocations must be based on the statewide average staff mix ratio of all noncharter public schools from the prior school year and the school's actual full-time equivalent enrollment. Categorical funding must be allocated to a charter school based on the same funding criteria used for noncharter public schools and the funds must be expended as provided in the charter contract. A charter school is eligible to apply for state grants on the same basis as a school district.

[3]The majority also cites to three other statutes for the proposition that the Act's terms identify restricted funds as the source of funding. Majority at 13 (citing RCW 28A.510.250; RCW 84.52.065, .067). First, none of these statutes are located within the Act and are thus not relevant to appellants' claim that the Act is facially invalid. Second, these statutes plainly do not require the use of restricted funds. In fact, none of them discuss the source of funding for charter schools. *See* RCW 28A.510.250 (establishing a schedule for when the Superintendent must allocate funds to schools); RCW 84.52.065 (requiring the State to levy a tax for common schools), .067 (requiring the state tax for common schools to be deposited into the general fund).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> 2. *The current funding scheme for charter schools is constitutional and consistent with precedent*

The State now funds public education primarily through the general fund. WASH. STATE OFFICE OF FIN. MGMT., A GUIDE TO THE WASH. STATE BUDGET PROCESS 6 (2014), http://www.ofm.wa.gov/reports/budgetprocess.pdf (45.1 percent of the general fund is spent on K-12 education). According to the Washington State Office of Financial Management, there are seven separate appropriations that comprise the overall allocations to public schools. Clerk's Papers (CP) at 1032. These include appropriations for (1) general apportionment, (2) pupil transportation, (3) special education, (4) institutional education programs, (5) programs for highly capable students, (6) transitional bilingual programs, and (7) the learning assistance program. *Id.* These seven appropriations are made primarily from the state general fund. *See, e.g.*, LAWS OF 2013, 2d Spec. Sess., ch. 4, §§ 501-516 (operational expenses for education).[4] Charter schools draw support from these appropriations.

This funding scheme is both constitutional and consistent with our precedent. The general fund is not identified as a restricted fund by article IX, nor are any of the seven separate appropriations that comprise the overall funding for public

---

[4]LAWS OF 2013, 2d Spec. Sess., ch. 4, § 502 ($5.581 billion for general apportionment), § 505 ($427 million for pupil transportation), § 507 ($738 million for special education programs), § 510 ($15 million for institutional education programs), § 511 ($10 million for programs for highly capable students), § 514 ($106 million for transitional bilingual programs), § 515 ($218 million for the learning assistance program).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

education. It is, as the name suggests, a general fund. Even our decision in *School District No. 20 v. Bryan*, relied on heavily by the majority, acknowledged that "all experiments in education must be indulged, if at all, at the expense of the general fund." 51 Wash. 498, 505, 99 P. 28 (1909).

The majority "find[s] unconvincing the State's view that charter schools may be constitutionally funded through the general fund" because restricted funds are not segregated from unrestricted funds. Majority at 16. Not only does this directly contradict established case law, *see Bryan*, 51 Wash. at 505, but taken to its full logical extent, it would mean that *any* expenditure from the general fund would be unconstitutional unless it was for the support of common schools.[5] This cannot be the case.

The majority also attempts to classify the entire $7.095 billion appropriation for public education as a restricted fund by relying on inapposite statutes and case law. The majority cites to RCW 28A.150.380 to support its claim that the entire appropriation for public education is restricted. Majority at 15. But RCW 28A.150.380(1) provides only that the legislature must "appropriate for the current use of the common schools such amounts as needed for state support to school

---

[5] In addition to K-12 schools, the general fund is used to support critical functions such as human services, higher education, governmental operating costs, and natural resources. *See* OFFICE OF FIN. MGMT., *supra*, at 6.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

districts." This statute is not an appropriations bill but, rather, a general mandate. The statute does not appropriate funds, nor does it even reference any of the seven appropriations that comprise our funding for public education. Most importantly, the statute does not prohibit the legislature from supporting additional, noncommon school educational programs with resources from the unrestricted portion of the general fund. In fact, the second half of this statute, RCW 28A.150.380(2), expressly permits appropriations for other educational programs, with no common school limitation. (The legislature may fund "special programs to enhance or enrich the program of basic education."). Indeed, programs, such as Running Start, that are not under the control of local voters and are thus not common schools, receive support through the $7.095 billion appropriation for public education. *See* LAWS OF 2013, 2d Spec. Sess., ch. 4, § 502(18); WASH. STATE BD. FOR CMTY. & TECH. COLLS., RUNNING START FINANCE STUDY REPORT: DECEMBER 2010 7, http://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=Runnin g%20Start%20Finance%20Study%20Report%20-%20Dec%202010_ef747037-8891-4bd7-8787-e55a1c185533.pdf (high schools reimburse community colleges for 93 percent of each student's tuition).

The majority next cites to *State ex rel. State Board for Vocational Education v. Yelle*, 199 Wash. 312, 91 P.2d 573 (1939). Majority at 13-14. There, the legislature

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

appropriated approximately $64,000 "'*from the current school fund*'" for the State

Board for Vocational Education in order to secure matching funds from the federal

government. *Yelle*, 199 Wash. at 313 (quoting LAWS OF 1939, ch. 223, § 2, at 940).

The court emphasized and heavily relied on the fact that the appropriation came from

the current school fund, which by definition was "'to be applied exclusively to the

common schools.'" *Id*. at 316 (quoting LAWS OF 1939, ch. 174, § 1, at 530). Thus, it

made sense that once money was allocated to the current school fund, it could not

thereafter be diverted to a noncommon school.

But *Yelle* does not control because our funding mechanism for public

education has materially changed since *Yelle* was decided in 1939. *See Fed. Way

Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 525, 219 P.3d 941 (2009) (distinguishing

prior case law on grounds that funding system had been replaced by a "completely

new and different funding mechanism"). The legislature no longer uses the current

school fund, and, in fact, the current school fund is extinct. This likely explains why

no court, until the majority, has ever cited to *Yelle* since it was first published nearly

80 years ago. The legislature now supports public education primarily through the

general fund. *See* LAWS OF 2013, 2d Spec. Sess., ch. 4, §§ 501-516 (operational

expenses for education). Unlike the current school fund, the general fund is

inherently unrestricted and may be used to support charter schools. *Yelle* did not

forbid the legislature from using unrestricted resources in the general fund for other

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

education purposes. Indeed, after *Yelle*, the legislature made a nearly identical appropriation to the Board for Vocational Education but this time from the general fund instead of the current school fund. *Compare* LAWS OF 1939, ch. 223, § 2, at 940 ("FROM THE CURRENT SCHOOL FUND"), *with* LAWS OF 1941, ch. 234, § 2, at 748 ("FROM THE GENERAL FUND").

The majority also cites to our plurality decision in *Mitchell*, where the legislature attempted to transport private school students with buses supported by restricted funds. 17 Wn.2d at 63-64. There, the State admitted that "the directors of the school district are using public funds '*from the state permanent school fund and the current school fund*' (italics ours) for the transportation, in a school bus, of children eligible to attend the common public schools to and from the Christian school." *Id.* at 64. Relying in part on this admission, the lead opinion noted that in order to carry out the legislation, "the directors of school districts must, of necessity, resort to the common school fund." *Id.* at 66. By contrast, the State here will not necessarily have to resort to the common school fund or any restricted fund in order to support charter schools. Notably, the concurrence in *Mitchell* recognized that schools that were not common schools could qualify for student transportation under the legislation so long as restricted funds were not used. *Id.* at 70-71 (Grady, J.,

Fairhurst, J. (concurring in part and dissenting in part)

concurring). The text of the Act does not command the use of restricted funds, and, as discussed above, the State may fund charter schools with general funds.[6]

The majority believes that once money is appropriated to our public schools from the general fund, it becomes restricted solely for the benefit of common schools. *See* majority at 12-13. Although the seven separate appropriations listed above can reasonably be considered public school funds, they are not common school funds. We recognized this critical distinction in *Moses Lake School District No. 161 v. Big Bend Community College*, concluding that while the diverted resources in that case might "have been public school funds, none were 'common school funds.'" 81 Wn.2d 551, 560, 503 P.2d 86 (1972); *see also Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 521, 585 P.2d 71 (1978) ("[T]he constitutional draftsmen must have contemplated that funds, other than common school funds, were available for and used to educate our resident children." (emphasis omitted)). The majority conflates the legislature's appropriation for public education with common school funds, an approach we have long rejected. *See Pac. Mfg. Co. v. Sch. Dist. No. 7*, 6 Wash. 121, 33 P. 68 (1893). Because charter schools are part of our system of public education, they are a proper recipient of public school funds.

---

[6]The majority also cites to *Leonard v. City of Spokane*, 127 Wn.2d 194, 897 P.2d 358 (1995). Majority at 15. But that case involved the direct usurpation of the state tax for common schools. *Leonard*, 127 Wn.2d at 199 (invalidating the legislation because it diverted revenue from property tax that would otherwise constitute the state tax for common schools). No such diversion exists here. Again, charter schools would receive support from the general fund.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

3.      *Appellants fail to meet their burden under a facial challenge*

Because the Act was enacted through the initiative process, we begin with the presumption that it is constitutional. *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000). Appellants have raised a facial challenge against the Act and must prove that the Act is unconstitutional beyond a reasonable doubt. *Id.* This requires a showing that the statute cannot be constitutionally applied under any circumstances. *Id.* "'[A] facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied.'" *Lummi Indian Nation v. State*, 170 Wn.2d 247, 258, 241 P.3d 1220 (2010) (quoting *Wash. State Republican Party v. Pub. Disclosure Comm'n*, 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000)).

The majority faults the State for not being able to "demonstrate that these restricted moneys are protected from being spent on charter schools." Majority at 15. This impermissibly shifts the burden of proof to the State.[7] It is well settled that, in a facial challenge, the burden rests on the plaintiff, here appellants. *Amalgamated Transit*, 142 Wn.2d at 205. Appellants fail to meet their burden for two reasons.

---

[7]The majority also runs contrary to the established presumption of constitutionality. "'In matters of economic legislation, we follow the rule giving every reasonable presumption in favor of the constitutionality of the law or ordinance.'" *Leonard*, 127 Wn.2d at 198 (quoting *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 642-43, 771 P.2d 260 (1989)). Here, because charter schools comprise only two percent of Washington's public schools, it is reasonable to assume that they can be funded using a portion of the $5.092 billion that is not restricted.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

First, as discussed at length above, appellants cannot prove that charter schools will receive resources from any of the three restricted funds. In *Moses Lake School District No. 161*, we placed the burden on the plaintiffs to show that constitutionally restricted funds were being diverted. 81 Wn.2d at 559-60. We concluded that the plaintiffs there could show no more than the diversion of public school funds, which are distinguishable from common school funds as referenced by article IX. *Id.* at 560. Similarly, appellants here can show no more than the use of general funds that have been appropriated to our public education system, of which charter schools are a part. Notably, appellants concede that unrestricted revenue from the general fund can be used to support noncommon schools, stating that "[n]othing prevents the Legislature or school districts from using unrestricted funds to support . . . supplemental programs and services." Reply Br. of Appellants at 18.

Second, even assuming that appellants and the majority were correct and the entire appropriation for public education was restricted solely for the use of common schools, the nature of an appropriation is that it is finite and renewed every two years. *See Wash. State Legislature v. State*, 139 Wn.2d 129, 145, 985 P.2d 353 (1999) ("[A] budget bill, by its nature, appropriates funds for a finite time period—two years."). The legislature is free to adjust its appropriations with any new biennial budget. Thus, it is well within the realm of possibility that the legislature may appropriate charter school funding separate and apart from the basic education appropriation in

15

*League of Women Voters v. State*, No. 89714-0
Fairhurst, J. (concurring in part and dissenting in part)

future budget bills. Indeed, in *Yelle*, the remedy was to fund vocational education using monies from the general fund the following biennium, not to abolish vocational schools. *Compare* LAWS OF 1939, ch. 223, § 2, at 940, *with* LAWS OF 1941, ch. 234, § 2, at 748. Because nothing prohibits the legislature from expressly appropriating funds to support charter schools separate and apart from the appropriation for public education in the next biennium, appellants' facial challenge must fail.[8]

As a final note, the flaws that appellants and the majority find with the current funding scheme are born from the way in which the State manages restricted funds, not through any fault of the Act or the voters who passed the Act. While the State's accounting may be troubling, I do not find the Act itself to be unconstitutional on its face.

B.     Provisions of the Act declaring charter schools to be common schools are severable

Provisions within an act are not severable if "it cannot reasonably be believed that the legislative body would have passed one without the other" or if "elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes." *Amalgamated Transit*, 142 Wn.2d at 227-28. Appellants argue

---

[8]One might think in future bienniums the legislature might appropriate resources from restricted funds to support charter schools. This the legislature cannot do because our state constitution prohibits appropriations from restricted funds.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that voters would not have passed I-1240 if they knew that charter schools were not common schools and, as such, could not be funded with restricted common school funds. I disagree for three reasons.

First, I-1240 would have passed even though charter schools may not receive restricted funds. I-1240 does not state that charter schools will receive restricted funds, and voters were never told anything to this effect. Rather, I-1240 states in general terms that charter schools shall "receive funding based on student enrollment just like existing public schools." RCW 28A.710.005(1)(n)(vii); *see also* RCW 28A.710.220(2) (requiring the Superintendent to fund charter schools without reference to restricted funds). I-1240 and the voters' pamphlet do not reference restricted funds likely because the current funding scheme for public education does not distinguish between restricted and unrestricted funds, and, thus, there was no framework to discuss this issue.

While the voters' pamphlet reveals that voters were very concerned about funding, this concern centered on the diversion of funds from local school districts rather than the source of funding. *See* CP at 553 (arguments for and against I-1240). Importantly, voters were never misled about the effect of I-1240 on local school districts. In fact, voters were repeatedly informed that I-1240 would "shift revenues, expenditures and costs between local public school districts *or from local public school districts to charter schools*, primarily from movement in student enrollment

17

. . . result[ing] in an indeterminate, *but non-zero*, fiscal impact to local public school districts." CP at 549 (emphasis added). Appellants allege that voters were misled to believe I-1240 was a "zero-sum game." Br. of Appellants at 28. This is inaccurate because the voters' pamphlet repeatedly described the fiscal impact of I-1240 as "indeterminate, but non-zero." CP at 549-51 (discussing the nonzero fiscal impact on nine occasions). Voters were properly informed. Because there is nothing to indicate that voters were concerned about the *source* of the funding, I-1240 would have passed even though charter schools are not eligible to receive restricted funds.

Second, I-1240 contains a severability clause. *See* CP at 78. "A severability clause may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid." *Amalgamated Transit*, 142 Wn.2d at 228. The majority correctly points out that a severability clause is not dispositive on the question of whether the legislative body would have enacted the remainder of the act. Majority at 18. But we have recently stated that "[w]here the initiative passed by the people contains a severability clause, the court may view this as 'conclusive as to the circumstances asserted unless it can be said that the declaration is obviously false on its face.'" *League of Educ. Voters v. State*, 176 Wn.2d 808, 827, 295 P.3d 743 (2013) (internal quotation marks omitted) (quoting *McGown v. State*, 148 Wn.2d 278, 296, 60 P.3d 67 (2002)). Appellants have not argued that the severability clause is obviously false. I would uphold the severability

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fairhurst, J. (concurring in part and dissenting in part)

clause and apply it here, concluding that the people would likely have passed the Act even if charter schools were not common schools.

Finally, elimination of the common school provisions would not render the Act useless to accomplish its purpose. The purpose of I-1240 was to establish 40 charter schools over the next five years. RCW 28A.710.005(1)(n). This purpose may be accomplished without designating public charter schools as common schools.

The majority believes that the voters would never have passed the Act without a funding source. Majority at 19. But the voters did just that because the Act itself does not contain any reference to a source of funding. This is not an uncommon occurrence, as Washington voters have enacted unfunded initiatives in the past. *See Fed. Way Sch. Dist. No. 210*, 167 Wn.2d at 520 (acknowledging voters passed legislation mandating cost of living increases for teachers but that the legislation provided no funding source).

I agree with the majority that charter schools are not common schools. But nothing in the Act requires the diversion of resources out of the three funds identified by article IX as restricted for the benefit of common schools. Rather, the State can constitutionally support charter schools through the general fund. I would not invalidate the Act but, rather, would hold that appellants cannot meet their burden on this facial challenge. I respectfully concur in part and dissent in part.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fairhurst, J.

González, J.

Gordon McCloud, J.