

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE OCT 2 5 2018
~Fairhurst~
CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Oct 25, 2018

*Susan L. Carlson*

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| EL CENTRO DE LA RAZA, a Washington nonprofit corporation; LEAGUE OF WOMEN VOTERS OF WASHINGTON, a Washington nonprofit corporation; WASHINGTON ASSOCIATION OF SCHOOL ADMINISTRATORS, a Washington nonprofit corporation; WASHINGTON EDUCATION ASSOCIATION, a Washington nonprofit corporation; INTERNATIONAL UNION OF OPERATING ENGINEERS 609; AEROSPACE MACHINISTS UNION, IAM&AW DL 751; WASHINGTON STATE LABOR COUNCIL, AFL-CIO; UNITED FOOD AND COMMERCIAL WORKERS UNION 21, WASHINGTON FEDERATION OF STATE EMPLOYEES; AMERICAN FEDERATION OF TEACHERS WASHINGTON; TEAMSTERS JOINT COUNCIL NO. 28; WAYNE AU, PH.D., on his own behalf and on behalf of his minor child, PAT BRAMAN, on her own behalf; and DONNA BOYER, on her own behalf and on behalf of her minor children, | No. 94269-2 |
| | EN BANC |
| Appellants, | Filed: OCT 2 5 2018 |
| v. | |

STATE OF WASHINGTON,                    )
                                        )
                                        )
              Respondent,               )
        and                             )
                                        )
                                        )
ROLAND D. BRADLEY, on his own           )
behalf and on behalf of his minor child;    )
GUSTAVO ALEJANDRO CUEVA, on his )
own behalf and on behalf of his minor child; )
GENEVIEVE FIORINO, on her own           )
behalf and on behalf and on behalf of her    )
minor children; NATALIE HESTER;         )
DELANAS D. JOHNSON, on his own          )
behalf and on behalf of his minor child;     )
GAHYUN "SUNNY" LEE, on her own          )
behalf and on behalf of her minor children;  )
JENNIFER DIANE LEE, on her own          )
behalf and on behalf of her minor child;     )
HEIDI A.R. MITCHELL and SCOTT D.        )
MITCHELL, on their own behalf and on    )
behalf of their minor child; EDUARDO    )
PACHECO, on his own behalf and on       )
behalf of his minor child; DARCELINA    )
JEAN SOLORIA, on her own behalf and     )
on behalf of her minor child;  CRYSTAL  )
SWAFFER, on her own behalf and on       )
behalf of her minor children; SHIRLINE  )
SHIRRELL WILSON, on her own behalf      )
and on behalf of her minor child;       )
INNOVATION SCHOOLS d/b/a                )
WILLOW PUBLIC SCHOOL;                   )
SPOKANE INTERNATIONAL                   )
ACADEMY; EXCEL PUBLIC CHARTER )
SCHOOLS; SOAR ACADEMY; PRIDE            )
PREP PUBLIC CHARTER SCHOOL;             )
RAINIER PREP; GREEN DOT PUBLIC          )
SCHOOLS WASHINGTON                      )
WASHINGTON STATE CHARTER                )

2

SCHOOLS ASSOCIATION,                )
                                     )
            Respondent-Intervenors.  )
_____      )

YU, J. — This case concerns the latest constitutional challenge to charter schools in our state. In 2015, this court held the charter school system created by Initiative 1240 (I-1240) (Charter School Act or Act) was unconstitutional primarily due to the funding structure. *League of Women Voters of Wash. v. State*, 184 Wn.2d 393, 413, 355 P.3d 1131 (2015). The following year, the legislature adopted a modified version of the Charter School Act that attempted to cure its constitutional deficiencies. LAWS OF 2016, ch. 241.

At the outset, we are aware of the deep-seated conflicting opinions regarding charter schools. While each side of the discussion may have legitimate points of view, it is not the province of this court to express favor or disfavor of the legislature's policy decision to create charter schools. Rather, our limited role is to determine whether the enacted legislation complies with the requirements of our state constitution. We conclude that its only unconstitutional provision is severable, and thus we affirm the trial court in part and hold that the remainder of the Charter School Act is constitutional on its face.

FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Washington voters approved I-1240, codified at chapter 28A.710 RCW, which created a public charter school system. LAWS OF 2013, ch. 2. In *League of Women Voters*, this court held that I-1240 violated article IX, section 2 of the Washington Constitution. 184 Wn.2d at 413. We concluded that I-1240 incorrectly designated charter schools as common schools and then impermissibly supported them with money allocated for common schools. *Id.* at 406-07. Because the unconstitutional provisions of I-1240 were not severable, the court did not reach the other challenges raised by the plaintiffs. *Id.* at 413.

In 2016, the legislature enacted the Charter School Act with amendments designed to cure its constitutional defects. LAWS OF 2016, ch. 241. The Act provides for the establishment of up to 40 charter schools, which are designated as public schools that are open to all children for free "as an alternative to traditional common schools." RCW 28A.710.150(1), .020(1)(b).

Plaintiffs[1] brought suit in King County Superior Court, seeking a declaratory judgment that the Act is facially unconstitutional. A number of charter school

---

[1] El Centro de la Raza, League of Women Voters of Washington, Washington Association of School Administrators, Washington Education Association, International Union of Operating Engineers Local 609, Aerospace Machinists Union, IAM&AW DL 751, Washington State Labor Council, AFL-CIO, United Food and Commercial Workers Union 21, Washington Federation of State Employees, American Federation of Teachers Washington, Teamsters Joint Council No. 28, Wayne Au, PhD, Pat Braman, and Donna Boyer.

supporters joined the suit as intervenor-respondents.[2] On cross motions for summary judgment, the trial court concluded that the Act did not on its face violate the Washington Constitution.[3] Clerk's Papers (CP) at 3744-69. Plaintiffs sought direct review from this court pursuant to RAP 4.2(a), and we granted review. We accepted seven amicus briefs supporting the State and intervenor-respondents.

## ISSUES[4]

A.    Whether the Act violates article IX, section 2's "general and uniform" requirement?

B.    Whether the Act violates article III, section 22 by delegating the superintendent's supervisory role to the charter school commission?

C.    Whether the Act violates article IX, section 2 by diverting restricted state funds to support charter schools?

D.    Whether the Act violates article II, section 37 by revising the state collective bargaining laws and the Basic Education Act of 1977, RCW 28A.150.200, without setting forth those revisions and amendments in full?

---

[2] There are 20 intervenor-respondents. They describe themselves as "a mixed group of charter public school students and parents; charter public schools themselves; a charter public school management organization; and a statewide nonprofit organization." Clerk's Papers (CP) at 52.

[3] Prior to summary judgment, the trial court dismissed two of plaintiffs' claims on justiciability grounds. CP at 193-206.

[4] Appellants also argued that the Act interferes with the State's paramount duty to amply fund education, as mandated by *McCleary v. State*, 173 Wn.2d 477, 269 P.3d 227 (2012). This court has since determined the State fulfilled its funding obligation, and so appellants' claim is now moot. Order, *McCleary v. State*, No. 84362-7, at 4 (Wash. June 7, 2018).

ANALYSIS

The Charter School Act represents a policy choice by the legislature to make charter schools available to Washington students. We have previously recognized that the legislature "provide[s] the best forum for addressing the difficult policy questions inherent in forming the details of an education system." *McCleary v. State*, 173 Wn.2d 477, 517, 269 P.3d 227 (2012). While the appellants may disagree with the legislature's policy decision in this instance, our review is limited to whether the Act violates the state constitution.

This case involves issues of statutory construction and constitutional questions, and thus the standard of review is de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). We look at the issues as if for the first time and therefore show no deference to the trial court's decision.

A.    The Act does not violate article IX, section 2's general and uniform system of public schools

Article IX, section 2 of the Washington Constitution sets the framework for the state's public school system. It states in relevant part:

> The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may hereafter be established.

CONST. art. IX, § 2. Accordingly, the constitution requires the legislature to provide a general and uniform system of public schools that includes common

schools. However, as we have previously held, the system is not limited to common schools because "art. [IX], § 2 provides for something considerably more extensive." *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 522, 585 P.2d 71 (1978). It also authorizes, but does not require, the legislature to create non-common-schools, such as high schools, normal schools,[5] or technical schools. At issue in this case is whether this provision in article IX, section 2 places any restrictions on the legislature's power to create non-common-schools.

Appellants argue this constitutional provision has two relevant limitations that the Act violates. First, they claim article IX, section 2 empowers the legislature to create *only* non-common public schools similar to those enumerated in the provision (high schools, normal schools, or technical schools). Because charter schools are not similar to the type of schools on the list, appellants reason the legislature does not have the authority to establish them. Second, appellants contend even if article IX, section 2 does not impose restrictions on the type of schools the legislature can create, it nevertheless requires that every school conform to the requirements of the "general and uniform system of public schools." Appellants argue charter schools do not.

---

[5] At statehood, normal schools provided training and certification for teachers.

1. Article IX, section 2 does not limit the legislature's authority to create non-common-schools

Appellants do not argue that article IX, section 2 contains an exhaustive list of all the non-common-schools the legislature may create, nor is there any limiting language in the provision to support such an interpretation. However, appellants do argue that high schools, normal schools, and technical schools represent the type of non-common-schools that the legislature can create. Appellants reason that at the time the constitution was written, these schools served a specialized population or taught a specialized educational program. Accordingly, appellants ask us to interpret article IX, section 2 as conferring to the legislature the power to create only specialized non-common-schools.

We have never interpreted article IX, section 2 to limit the legislature's ability to create non-common-schools. In one of our earliest cases interpreting the provision, this court endorsed the power of the legislature to create a non-common-school that did not serve a specialized student population or teach a specialized curriculum. *Sch. Dist. No. 20 v. Bryan*, 51 Wash. 498, 506, 99 P. 28 (1909). Legislation passed shortly after statehood established a model training school embedded in each normal school. Senior teachers-in-training at the normal school acquired "actual practice" teaching students sent from the nearby common school.

8

LAWS OF 1893, ch. 107, § 12. Though a model school could refuse to accept students "by reason of incorrigibility, or mental defects," enrollment was not otherwise limited to a specialized population. LAWS OF 1907, ch. 97, § 2.

While this court determined the legislation was unconstitutional, its decision rested on the schools' funding source and not their program of education or student body. *Bryan*, 51 Wash. at 506. These model training schools were unconstitutional because the legislature improperly designated them as common schools and funded them with constitutionally protected common school money. But the court was careful to note, "It is not that the legislature cannot make provision for the support of a model training school, but in its attempt to do so, it has made provision for it out of the wrong fund." *Id.* Therefore, *Bryan* supports the conclusion that article IX, section 2 does not prevent the legislature from creating non-common-schools that are not specialized so long as they do not use funds allocated for common schools.

Appellants argue that *Bryan* is only one of many decisions where this court has struck down legislation supporting non-common-schools. But, just as in *Bryan*, the court's decisions have always turned on the legislature's improper use of common school money. *State ex rel. State Bd. for Vocational Educ. v. Yelle*, 199 Wash. 312, 316-17, 91 P.2d 573 (1939) (vocational rehabilitation of disabled persons cannot be paid for by the common school fund); *Mitchell v. Consol. Sch.*

*Dist. No. 201*, 17 Wn.2d 61, 66, 135 P.2d 79 (1943) (plurality opinion) (students

attending private and parochial schools cannot use public school transportation paid

for by the common school fund); *League of Women Voters*, 184 Wn.2d at 413

(charter schools are not common schools and cannot use common school funds).

None of these cases stand for the proposition that non-common-schools can provide

only specialized educational opportunities.

In sum, article IX, section 2 does not restrict the legislature's ability to create

non-common-schools that provide a general education and are open to all students.[6]

2.      The Act complies with the general and uniform system of public schools

When the legislature exercises its authority to create a non-common-school

then the school must conform to the requirements of the "general and uniform

system of public schools." CONST. art. IX, § 2. We most recently described this

system in *Federal Way School District No. 210 v. State*:

> "A general and uniform system, we think, is, at the present time, one in
> which every child in the state has free access to certain minimum and
> reasonably standardized educational and instructional facilities and
> opportunities to at least the 12th grade—a system administered with
> that degree of uniformity which enables a child to transfer from one

---

[6] The State, intervenor-respondents, and amici argue that if this court accepts appellants' argument, then it jeopardizes numerous non-common-schools or programs provided at non-common-schools. See, for example, tribal compact schools, RCW 28A.715.020; Running Start, RCW 28A.600.310; high school programming operated in community college, RCW 28B.50.533; "Youth Offender Program" operated by the Department of Corrections under contract with Centralia College, RCW 28A.193.020; CP at 2207; and online learning operated by nonprofits or private entities, RCW 28A.232.010. However, the constitutionality of these schools and programs is not before this court.

district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education."

167 Wn.2d 514, 524, 219 P.3d 941 (2009) (quoting *Northshore Sch. Dist. No. 417 v. Kinnear*, 84 Wn.2d 685, 729, 530 P.2d 178 (1974) (plurality opinion), *overruled on other grounds by Seattle Sch. Dist. No. 1*, 90 Wn.2d at 514).

Based on this definition, we held that the Basic Education Act (BEA), which provides (1) uniform educational content, (2) teacher certification, (3) minimum instructional hour requirements, and (4) a "statewide assessment system enabling students to transfer from one school district to another without loss of credit and with access to substantially the same educational opportunities," satisfies the general and uniform system of public schools mandated by article IX, section 2. *Id.* at 524-25.

       i.     The Act is sufficiently similar to the BEA in relevant parts to satisfy uniformity

The Act is sufficiently similar to the BEA in pertinent parts, and a comparison of the two shows this similarity. First, charter schools provide the same uniform educational content as the BEA because they provide the same instructional program of basic education. *Id.* The Act states that charter schools must "[p]rovide a program of basic education" that includes (1) the goals codified at RCW 28A.150.210, which aim to ensure that schools provide all students the

11

opportunity to obtain knowledge and skills essential to their success,[7] (2) instruction in the essential academic learning requirements (EALRs), which are developed by the superintendent of public instruction and "identify the knowledge and skills all public school students need to know and be able to do," RCW 28A.655.070(1), and (3) the statewide student assessment, which is developed by the superintendent and assesses students' mastery of the EALRs in the areas of reading, writing, mathematics, and science. RCW 28A.710.040(2)(b).

While the Act does not define "program of basic education," the legislature expressly directs us to construe Title 28A RCW "in pari materia even though as a matter of prior legislative history they were not originally enacted in the same statute." RCW 28A.900.040. Therefore, we consult the definition of "program of basic education" found in the BEA and applicable to common schools. RCW 28A.150.203(9). "'Program of basic education' means the overall program under RCW 28A.150.200 and deemed by the legislature to comply with the requirements of Article IX, section 1 of the state Constitution." *Id.* RCW 28A.150.200(2)(a), in

---

[7] The learning goals are as follows: "(1) Read with comprehension, write effectively, and communicate successfully in a variety of ways and settings and with a variety of audiences; (2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history, including different cultures and participation in representative government; geography; arts; and health and fitness; (3) Think analytically, logically, and creatively, and to integrate technology literacy and fluency as well as different experiences and knowledge to form reasoned judgments and solve problems; and (4) Understand the importance of work and finance and how performance, effort, and decisions directly affect future career and educational opportunities." RCW 28A.150.210.

turn, states that the "minimum components" for the instructional program of basic education are outlined in RCW 28A.150.220. The components are:

(a) Instruction in the [EALRs] under RCW 28A.655.070;

(b) Instruction that provides students the opportunity to complete twenty-four credits for high school graduation, beginning with the graduating class of 2019 or as otherwise provided in RCW 28A.230.090. Course distribution requirements may be established by the state board of education under RCW 28A.230.090;

(c) If the essential academic learning requirements include a requirement of languages other than English, the requirement may be met by students receiving instruction in one or more American Indian languages;

(d) Supplemental instruction and services for students who are not meeting academic standards through the learning assistance program under RCW 28A.165.005 through 28A.165.065;

(e) Supplemental instruction and services for eligible and enrolled students and exited students whose primary language is other than English through the transitional bilingual instruction program under RCW 28A.180.010 through 28A.180.080;

(f) The opportunity for an appropriate education at public expense as defined by RCW 28A.155.020 for all eligible students with disabilities as defined in RCW 28A.155.020; and

(g) Programs for highly capable students under RCW 28A.185.010 through 28A.185.030.

RCW 28A.150.220(3).[8]  In sum, charter schools, just like common schools, provide the instructional program of basic education in the BEA.[9]

Just as the BEA does for common schools, the Act requires charter schools to employ certified teachers with limited exceptions that also apply to common schools.  RCW 28A.710.040(2)(c).  Charter schools also must provide the same minimum instructional hours as common schools as mandated by the program of basic education.[10]  RCW 28A.150.220(2).

Finally, just like the BEA, the Act requires charter schools to participate in the statewide assessment, and nothing in the Act's plain language inhibits students' ability to transfer between schools.  RCW 28A.710.040(2)(b).  We are unpersuaded by appellants' claim that students who transfer into charter schools from other

---

[8] At the time this lawsuit was filed RCW 28A.150.220(3)(d) read, "Supplemental instruction and services for *underachieving* students through the learning assistance program under RCW 28A.165.005 through 28A.165.065." Former RCW 28A.150.220(3)(d) (2014) (emphasis added).  The legislature has since replaced "underachieving students" with "students who are not meeting academic standards." ENGROSSED H.B. 2242, 65th Leg., 3d Spec. Sess. (2017).  Because the provision is substantively identical, we list the law as it stands today.

[9] In addition, the State asserts that all charter school contracts require compliance with the BEA's instructional program of basic education pursuant to RCW 28A.150.200 and .220.  Br. of Resp't State of Wash. at 27; *see also* WAC 180-19-030(4)(e).

Appellants also sought review on whether the Act unconstitutionally delegates to charter schools the authority to define the components of a program of basic education.  Appellants' Statement of Grounds for Direct Review at 7.  Because we hold charter schools provide the same instructional program of basic education as common schools, we do not reach appellants' delegation argument.

[10] Declarations submitted at the trial court also indicate all charter schools meet the instructional hours required by the BEA.  CP at 973-74, 1100.

public schools may lose credits. Br. of Appellants at 29. The Act states that other public schools must honor credits earned "in the charter school[s] in the same manner and according to the same criteria that credits are accepted from other public schools." RCW 28A.710.060(2). While the Act is silent on how credits are calculated when a student enters a charter school, no provision of the Act indicates charter schools will not honor credits earned elsewhere. Accordingly, the Act does not on its face break the uniformity requirement by interfering with students' ability "'to transfer from one district to another within the same grade without substantial loss of credit or standing.'" *Fed. Way Sch. Dist. No. 210*, 167 Wn.2d at 524 (quoting *Northshore Sch. Dist. No. 417*, 84 Wn.2d at 729).

Justice Madsen's dissent does not dispute that charter schools provide the same program of basic education, employ certified teachers, meet the minimum instructional hours, and participate in the statewide assessment. The dissent nevertheless concludes without evidence that charter schools violate uniformity because they "frustrate a student's access to standardized educational opportunities and his or her ability to freely transfer to other schools without negative impact." Dissent (Madsen, J.) at 6. In essence, the dissent would hold that all public schools must be *identical* to common schools in order to satisfy uniformity. There is no support for such a sweeping assertion. Neither the constitution nor our precedent require non-common-schools to be indistinguishable from common schools, and

adopting the dissent's position would greatly limit the legislature's ability to innovate.

In sum, charter schools are not rendered unconstitutional just because they do not operate identically to common schools. The Act on its face satisfies the general and uniform system of public schools because, in relevant parts, it is sufficiently similar to the BEA, which we have already held satisfies article IX, section 2.

        ii.        Non-common-schools are not required to have locally elected school boards

As described above, charter schools satisfy the general and uniform system as defined in *Federal Way School District No. 210*, but we address an argument raised by appellants and Justice Madsen's dissent regarding local voter control. Both appellants and Justice Madsen's dissent argue the Act violates article IX, section 2 because, unlike common schools, charter schools are not run by locally elected school boards. This argument attempts to extend the local voter control requirement that applies to common schools to all public schools, but the public school system "is neither limited to common schools nor is it synonymous therewith." *Seattle Sch. Dist. No. 1*, 90 Wn.2d at 522. Therefore, while *Bryan* established that local voter control "is a most important feature" of common schools, we have never said it is a constitutional requirement that applies to all

16

schools in the general and uniform system of public schools. *Bryan,* 51 Wash. at 504.

Justice Madsen's dissent concedes that *Bryan*'s discussion of local voter control is limited to common schools, but it nevertheless argues that local voter control is "an established core characteristic" of the general and uniform system. Dissent (Madsen, J.) at 4. This conclusion is not supported by precedent or history. As previously discussed, the court in *Bryan* determined the model schools were unconstitutional—not because of their governance structure, but because they were improperly funded using common school money. The court did not declare that model schools must have locally elected school boards but, instead, noted that all such "experiments in education must be indulged, if at all," using non-constitutionally-protected funds. *Bryan,* 51 Wash. at 505. Therefore, *Bryan* does not suggest that local voter control is an essential element of the general and uniform system of public schools.

There are also numerous examples of non-common-schools without locally elected school boards that date back to this state's founding. The first normal schools, a type of non-common-school expressly recognized in article IX, section 2, were established the year after the constitution was written. LAWS OF 1890, § 1, at 278, § 1, at 281. They were governed by separate unelected boards of trustees. *Id.* § 4, at 278, § 3, at 282. Today, the State and intervenor-respondents also identify

many non-common-schools that are not subject to local voter control. Br. of Resp't State of Wash. at 33; Intervenor-Resp'ts' Br. at 6-7.

It also makes sense that charter schools are not required to have locally elected school boards because of their funding source. Unlike common schools, charter schools receive no local levy money. Therefore, they do not raise the same concerns as common schools about local control over locally raised tax dollars.

In sum, the Act does not violate article IX, section 2 due to lack of a locally elected school board because the constitution does not require it.

B.  The Act does not violate article III, section 22 by delegating the superintendent's supervisory role to the Washington State Charter School Commission

Article III, section 22 provides, "The superintendent of public instruction shall have supervision over all matters pertaining to public schools, and shall perform such specific duties as may be prescribed by law." Appellants and Justice Wiggins' dissent argue the Act divests the superintendent of his supervisory power over charter schools because it creates the Washington State Charter School Commission (Commission).

The Commission is an independent state agency with the authority to authorize charter schools anywhere in the state. RCW 28A.710.070(1).[11] The

---

[11] A school district can also apply to be an authorizer through the Washington State Board of Education. RCW 28A.710.090. Once approved, it can authorize charter schools within its district.

Commission reviews charter school applications according to nationally recognized procedures, practices, and criteria. RCW 28A.710.140. If the Commission grants an application, it executes a contract with the school that sets academic and operational expectations with metrics such as student achievement, the school's financial performance, and its compliance with its contract and all laws. RCW 28A.710.160(2), .170(2).

The Commission is also charged with "continually monitor[ing] the performance and legal compliance" of the schools it authorizes "to ensure the highest standards of accountability and oversight for these schools." RCW 28A.710.180(1), .070(1). If the Commission determines that a school is not complying with its legal obligations, then it can impose sanctions or revoke the school's contract. RCW 28A.710.180(3)-(4). It cannot renew a school's contract if the school performs in the bottom quartile on the student achievement index, absent exceptional circumstances. RCW 28A.710.200(2). In essence, the Commission functions like a school district board that monitors the performance and operation of its schools.

The superintendent of public instruction is an integral part of the Commission. The superintendent is one of the Commission's 11 members and is joined by the chair of the state board of education and 9 members appointed by the governor, senate, and the house of representatives. RCW 28A.710.070(3). The

19

Commission is also housed at the office of the superintendent for administrative purposes. RCW 28A.710.070(8). Despite the superintendent's critical role on the Commission, the issue raised by appellants and Justice Wiggins' dissent is whether the Commission interferes with the superintendent's constitutional duty to supervise all public schools because the Commission oversees the schools it authorizes. CONST. art. III, § 22.

While there is no relevant precedent from this court interpreting article III, section 22, we have interpreted what the term "supervision" means in other contexts. In *Great Northern Railway Co. v. Snohomish County*, this court was asked to interpret the term *"general supervision,"* which appeared in a statute giving the state board of tax commissioners general supervision over assessors and county boards of equalization. 48 Wash. 478, 483, 93 P. 924 (1908). Supervision, the court determined, requires "'the power to review all the acts of the local officers, and to correct, or direct a correction of, any errors committed by them. Any less power than this would make the "supervision" an idle act, —a mere overlooking without power of correction or suggestion.'" *Id.* at 484 (quoting *Vantongeren v. Heffernan*, 5 Dakota 180, 38 N.W. 52, 56 (1888)).

This court later applied that definition of general supervision to the superintendent of public instruction's supervisory powers as codified by the school code. *State ex rel. Sch. Dist. No. 301 v. Preston*, 84 Wash. 79, 86, 146 P. 175

(1915). The court concluded that the superintendent's supervision meant "something more than the power merely to confer with and advise, or to receive reports, or file papers. In other words, that the power of supervision is not granted to an officer as a mere formality." *Id.* at 86-87.

While we have not applied our interpretation of the term supervision to article III, section 22, the attorney general has, and we consider official opinions persuasive authority. *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 828, 748 P.2d 1112 (1988); *see* 1975 Op. Att'y Gen. 1, at 8. The attorney general notes that the legislature "is quite free to shape the state's education system as it may choose, and to define the Superintendent's role within that system" so long as it respects the superintendent's supervisory role. 1998 Op. Att'y Gen. No. 6, at 4. Accordingly, the attorney general determined the legislature may delegate administration of a program of basic education to an agency or institution so long as the superintendent retains supervision and is not made subordinate to any other agency. 2009 Op. Att'y Gen. No. 8, at 15 (citing 1998 Op. Att'y Gen. No. 6, at 4).

Therefore, considering our case law and the opinions of the attorney general, there is no article III, section 22 violation so long as the Commission does not interfere with the superintendent's power to take corrective action and so long as the superintendent is not made subordinate to the Commission.

The Act expressly recognizes the superintendent's supervisory duty when it states, "Charter schools are subject to the supervision of the superintendent of public instruction and the state board of education, including accountability measures, to the same extent as other public schools, except as otherwise provided in this chapter." RCW 28A.710.040(5). There is nothing in chapter 28A.710 RCW that qualifies or diminishes the superintendent's powers.

The Commission does not interfere with the superintendent's statutory duties. For example, the superintendent develops and revises the EALRs that are a mandatory component of the program of basic education used in charter schools and common schools. RCW 28A.655.070(1). The superintendent manages teacher certification, and charter schools must employ certified teachers. RCW 28A.410.010(2); RCW 28A.710.040(2)(d). The superintendent develops the statewide student assessment, which charter schools must complete. RCW 28A.655.070(3)(a). Finally, the superintendent reports on the management and improvement of all public schools, which includes charter schools. RCW 28A.300.040(2). The Commission does not play a role in the superintendent's execution of any of these codified duties.

Nor does the Commission divest the superintendent of financial control over Commission-authorized charter schools. Appellants place great weight on language in the Act that states the superintendent "shall distribute state funding to charter

schools." RCW 28A.710.220(2). Appellants allege this mandate means the superintendent can never withhold funds.[12] However, nothing in this statutory language points to any interference by the Commission in how funding is distributed. There are also similar statutory provisions applicable to both common schools and non-common-schools, and there is no indication that they prevent the superintendent from withholding funds when necessary. RCW 28A.510.250(1) (the superintendent "*shall apportion* from the state general fund" money for common schools (emphasis added)); RCW 28A.715.040(2) (funding for tribal compact schools "*shall be apportioned* by the superintendent of public instruction" (emphasis added)).[13]

---

[12] The superintendent has recovered funds from a charter school. First Place Scholars Charter School was overpaid due to "some recordkeeping and reporting inadequacies by the school" and enrollment falling below initial projections. CP at 2206. The superintendent withheld a portion of its disbursements and First Place Scholars Charter School later reimbursed the superintendent the remaining overpayment. *Id.*

[13] The State cites numerous WACs as evidence that the superintendent maintains financial control over charter schools. They are not critical to a facial challenge of the Act, but they highlight the superintendent's involvement in the budget process for charter schools. The superintendent reviews a charter school's adopted budget annually, including, but not limited to, "completion of data entry and edit, review of revenues and unreserved fund balances for accuracy, appropriateness of expenditures, and determination of whether or not the budget is in compliance with this chapter, state statutory law, and budget instructions issued by the superintendent of public instruction." WAC 392-123-0795. If the budget does not comply with applicable law, then the superintendent notifies the charter school board and the charter school's authorizer. WAC 392-123-080. The superintendent can impose binding restrictions on a charter school to improve its financial position if the schools is unable to balance its budget. WAC 392-123-060. If the authorizer finds the charter school has not complied with the binding restrictions, then the superintendent may withhold funds. WAC 392-123-065.

Justice Wiggins' dissent infers a constitutional violation because each statutory provision assigning duties to the Commission does not also explicitly state that the superintendent still maintains his or her constitutional supervisory authority. The dissent then concludes that any power given to the Commission necessarily takes supervisory power away from the superintendent. Nothing in the Act requires this interpretation. The Act gives the Commission enumerated powers, but it does not disturb the superintendent's supervision.

It would be absurd to require that every statute that gives power to an individual or entity also include a recitation of the superintendent's inherent, constitutionally granted supervisory authority. Statutes related to common schools' boards of directors do not include such a disclaimer. For example, RCW 28A.150.230 outlines the responsibilities of common school boards of directors. Boards supervise various aspects of the districts, including adopting policies that "establish performance criteria and an evaluation process for its superintendent, classified staff, certificated personnel, including administrative staff, and for all programs constituting a part of such district's curriculum." RCW 28A.150.230(2)(a). Boards are similarly charged with adopting policies to establish final curriculum standards and to evaluate teaching materials. *Id.* at (2)(f)-(g). Nowhere in the statute does it declare that the powers given to the school board are limited by article III, section 22. Just as it is unnecessary to reiterate the

superintendent's power over school boards, it is unnecessary to reiterate the superintendent's power over the Commission.

In sum, we hold that on its face the Act does not violate article III, section 22. There is nothing in the Act that interferes with the superintendent's supervisory duty, and so we conclude that the superintendent supervises charter schools in the same manner as all other public schools. The phrase "except as otherwise provided" appears to open the door to qualify or diminish the superintendent's power, but any such amendment risks jeopardizing the Act's constitutionality. RCW 28A.710.040(5). Were the Commission to interfere with the superintendent's supervisory authority, as feared by Justice Wiggins' dissent, an as-applied challenge would be appropriate.

C.    The Act does not violate article IX, section 2 by diverting restricted common school funds to support charter schools

Article IX, section 2 protects funding for common schools by requiring that "the entire revenue derived from the common school fund and the state tax for common schools *shall be exclusively applied* to the support of the common schools." (Emphasis added.)[14] While the constitution refers to a "common school fund," today the restricted common school money is commingled with unrestricted money in the general fund. Because "[t]here is no way to track the restricted

---

[14] Article IX, section 3 also establishes the common school construction fund for the exclusive use of common schools.

common school funds or to ensure that these dollars are used exclusively to support the common schools," this court held non-common-schools cannot be funded out of the general fund. *League of Women Voters*, 184 Wn.2d at 409.

The legislature has directed that charter schools are now to be funded by the Opportunity Pathways Account (OPA), which is funded by lottery revenue. RCW 28A.710.270; RCW 28B.76.526. It is undisputed that the OPA is the sole funding source for charter schools, and it contains no money from the general fund. CP at 2310, 2312.

Appellants allege that the Act, "[a]lbeit [i]ndirectly," diverts restricted common schools funds to charter schools. Br. of Appellants at 32 (underlining omitted). Appellants first argue that charter schools' costs are increasing and they will exhaust the OPA, forcing the legislature to use the general fund to pay for charter schools. Alternatively, appellants contend that as more charter schools are established, costs will rise and they will use a greater portion of the OPA, which also supports education scholarships and early education programming. RCW 28B.76.526. Appellants then reason the legislature will use the general fund to supplement funding for non-charter-school programs that currently rely on the

OPA, though there is no authority for why the legislature is prohibited from doing so.[15]

Our inquiry ends with the Act's plain language because charter schools are funded exclusively by the OPA and therefore receive no money from the general fund. Appellants only speculate that the legislature will use an improper funding source if and when it exhausts the OPA, but this is better reserved for an as-applied challenge. Therefore, we hold that the Act does not on its face violate article IX, section 2 by diverting restricted common school money to charter schools.

D.     The provision of the Act that violates article II, section 37 is severable

Article II, section 37 provides, "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Appellants argue the Act violates this constitutional provision because it changes the collective bargaining rights of charter school employees without fully setting forth those revisions.[16] Appellants allege existing laws give *all* public school employees the right to organize across schools within a school

---

[15] Appellants also ask this court to take judicial notice of the latest enacted budget as evidence that the legislature is using more general fund money for *other* programs that also receive money from the OPA. Reply of Appellants at 23. They ask us to infer that charter schools must be the cause of any budget adjustments. Because the legislature did not use general fund money to support charter schools, we do not speculate about other legislative appropriations.

[16] Appellants also argue that the Act violates article II, section 37 because it amends the BEA by allowing charter schools to alter components of the instructional program of basic education. Br. of Appellants at 46. Because we hold that charter schools are required to provide the instructional program of basic education in the BEA, we do not further address appellants' claim.

district. They contend the Act amends without reference these existing laws to restrict the rights of charter school employees.

Appellants' challenge concerns two of the state's collective bargaining laws, chapters 41.59 and 41.56 RCW. Chapter 41.59 RCW gives certified school district employees "the right to self-organization, to form, join, or assist employee organizations, [and] to bargain collectively." RCW 41.59.060(1). Chapter 41.56 RCW applies broadly to public employees but excludes those covered by other collective bargaining laws like chapter 41.59 RCW. RCW 41.56.020. Its purpose is to "provid[e] a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers." RCW 41.56.010. Both chapters outline the process for how collective bargaining units are determined. RCW 41.59.080; RCW 41.56.060.

The Act adds a nearly identical section to chapters 41.59 and 41.56 RCW. RCW 41.59.031; RCW 41.56.0251. In relevant part, the new provision provides:

> This chapter applies to any charter school established under chapter 28A.710 RCW. Any bargaining unit or units established at the charter school must be limited to employees working in the charter school and must be separate from other bargaining units in school districts, educational service districts, or institutions of higher education. Any charter school established under chapter 28A.710 RCW is a separate employer from any school district, including the school district in which it is located.

RCW 41.59.031; RCW 41.56.0251. While the Act expressly applies chapters 41.59 and 41.56 RCW to charter schools, it significantly limits the bargaining right of charter school employees by restricting their bargaining units to individual charter schools. The Act does not reference any other existing collective bargaining laws, including the statutes that direct how bargaining units are determined. *See* RCW 41.59.080; RCW 41.56.060. The issue is whether the legislature violated article II, section 37 when it limited the bargaining units of charter school employees to individual schools but did not lay out in full or reference any other existing collective bargaining laws.

We use a two-part test to evaluate an article II, section 37 challenge because while "'[n]early every legislative act of a general nature changes or modifies some existing statute, either directly or by implication,'" that does not necessarily mean that the legislation is unconstitutional. *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 640, 71 P.3d 644 (2003) (quoting *Holzman v. City of Spokane*, 91 Wash. 418, 426, 157 P. 1086 (1916)). First, we consider whether "'the new enactment [is] such a complete act that the scope of the rights or duties created or affected by the legislative action can be determined without referring to any other statute or enactment.'" *State v. Manussier*, 129 Wn.2d 652, 663, 921 P.2d 473 (1996) (quoting *Wash. Educ. Ass'n v. State*, 97 Wn.2d 899, 903, 652 P.2d 1347 (1982)). The purpose of this part of the test is to make sure the effect of new

legislation is clear and to "'avoid[ ] confusion, ambiguity, and uncertainty in the statutory law through the existence of separate and disconnected legislative provisions, original and amendatory, scattered through different volumes or different portions of the same volume.'" *Amalg. Transit Union Local 587 v. State*, 142 Wn.2d 183, 245, 11 P.3d 762 (2000) (quoting *Flanders v. Morris*, 88 Wn.2d 183, 189, 558 P.2d 769 (1977)).

Turning to the second part of the test, we ask whether "'a straightforward determination of the scope of rights or duties under the existing statutes [would] be rendered erroneous by the new enactment.'" *Manussier*, 129 Wn.2d at 663 (quoting *Wash. Educ. Ass'n*, 97 Wn.2d at 903). If the answer is no, the legislation does not violate article II, section 37. This prong of the test ensures that the legislature is aware of the legislation's impact on existing laws. *Amalg. Transit*, 142 Wn.2d at 246.

The Act satisfies the first part of the test because it is complete. The rights of charter school employees are "readily ascertainable from the words of the statute alone." *Citizens for Responsible Wildlife Mgmt.*, 149 Wn.2d at 642. It does not matter that the Act defines bargaining units for charter school employees differently than for other public school employees because the rights of charter school employees can be understood by reading only the Act.

30

The answer to the second part of the test is more difficult to determine. To understand whether the Act alters any existing rights, we separately analyze the existing collective bargaining rights pursuant to chapters 41.59 and 41.56 RCW. Chapter 41.59 RCW confers collective bargaining rights to certified school district employees. RCW 41.59.020(4). But charter school employees are not school district employees. Most charter schools are authorized by the Commission and have no relationship to a school district. The employees of those authorized by school districts are also not school district employees pursuant to their charter contracts. CP at 1004. Therefore, there is no article II, section 37 violation with respect to chapter 41.59 RCW because no rights were altered; certified school district employees did not have an existing right to bargain with certified charter school employees.

Chapter 41.56 RCW provides collective bargaining rights to "any county or municipal corporation, or any political subdivision of the state of Washington," except those covered by other collective bargaining laws. RCW 41.56.020. Its sweeping application means public school employees, including noncertified charter school employees, have collective bargaining rights. One of those rights concerns the way that bargaining units are determined. The statute charges the Public Employment Relations Commission (PERC) with determining, modifying, or combining bargaining units after considering employees' duties, skills, and

working conditions; history of collective bargaining; organization; and desires. RCW 41.56.060(1). Nothing in the statute's plain language prohibits PERC from creating a bargaining unit that includes school district *and* charter school employees.

Appellants argue the Act amends existing laws like RCW 41.56.060 because bargaining units must be individual charter schools regardless of factors like employees' duties, skills, and working conditions. But because the legislature did not lay out existing laws, appellants contend "[t]he impact of the Act's restrictions . . . cannot be fully understood." Br. of Appellants at 46. Appellants rely on *Washington Education Ass'n v. State*, 93 Wn.2d 37, 38, 604 P.2d 950 (1980), where this court considered an appropriations bill that set limits on salary increases for certain school district employees. Existing laws empowered school districts "to spend funds, from whatever source, as they choose on teacher salaries." *Id.* at 41. The court determined that the bill was unconstitutional because it attempted to amend the school districts' power without fully setting out the existing law. *Id.* Similar to *Washington Education Ass'n*, appellants argue that while the Act purports to grant charter school employees bargaining rights, the Act actually significantly reduces their existing power.

In contrast, the State argues that the legislature did not amend existing laws because it "simply added charter school employees to the many sets of public

employees covered by RCW 41.56." Br. of Resp't State of Wash. at 49. The State's argument is not well taken because noncertified charter school employees effectively had existing rights pursuant to chapter 41.56 RCW, even if the charter schools did not yet exist. The State also attempts to justify the legislature's action by arguing the legislature has made similar carve-outs for other groups of employees and separately defined their bargaining units. *See, e.g.*, RCW 41.56.025 (restricting the bargaining units of education providers who teach juveniles detained at Department of Corrections facilities). However, our only concern is whether the legislature complied with the requirements of article II, section 37 in this instance.

We return to the purpose of article II, section 37, which is to ensure that "'[c]itizens or legislatures must not be required to search out amended statutes to know the law on the subject treated in a new statute.'" *Wash. Citizens Action of Wash. v. State*, 162 Wn.2d 142, 152, 171 P.3d 486 (2007) (quoting *Wash. Ass'n of Neigh. Stores v. State*, 149 Wn.2d 359, 373, 70 P.3d 920, *abrogated on other grounds by Filo Foods, LLC v. City of SeaTac*, 183 Wn.2d 770, 357 P.3d 1040 (2015)). In this case, the Act produces the exact harm article II, section 37 attempts to avoid: it requires a thorough search of existing laws in order to understand the Act's effect on other provisions of chapter 41.56 RCW. After careful review, it is clear that charter school employees not covered by chapter 41.59 RCW would be covered by chapter 41.56 RCW because they are public employees. It is also clear

33

that absent legislation restricting their rights, charter school employees' bargaining units would not be restricted to individual charter schools because bargaining unit determinations would be controlled by RCW 41.56.060. Therefore, the effect of the Act is to greatly restrict the existing bargaining rights of charter school employees without "explicitly show[ing] how [the Act] relates to statutes it amends." *Id.* (emphasis omitted). We hold this violates article II, section 37.

The next question is whether the Act's offending provision is severable. In making a severability determination, we consider

> "whether the constitutional and unconstitutional provisions are so connected . . . that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."

*State v. Abrams*, 163 Wn.2d 277, 285-86, 178 P.3d 1021 (2008) (alteration in original) (quoting *Gerberding v. Munro*, 134 Wn.2d 188, 197, 949 P.2d 1366 (1998)).

As to the first requirement, we have held that when legislation includes a severability clause, it "provide[s] the necessary assurance that the Legislature would have enacted the appropriate sections of the legislation despite the unconstitutional sections." *Gerberding*, 134 Wn.2d at 197. In this case, the legislature included a severability clause that states, "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of

the provision to other persons or circumstances is not affected." ENGROSSED SECOND SUBSTITUTE S.B. 6194, at § 305, 64th Leg., Reg. Sess. (Wash. 2016). This clause favors concluding that the legislature still would have passed the Act absent the offending provision.

Turning to the second requirement, the collective bargaining rights of noncertified employees are not so intertwined as to undermine the purpose of the legislation. The purpose of the Act is to authorize the creation of up to 40 charter schools over a five-year period. RCW 28A.710.150(1). This purpose is not undercut when the bargaining units of noncertified employees are not limited to individual charter schools. Our determination is also bolstered by the fact that the provision is "'grammatically, functionally, and volitionally severable.'" *Abrams*, 163 Wn.2d at 287 (quoting *McGowan v. State*, 148 Wn.2d 278, 295, 60 P.3d 67 (2002)). It stands alone as a separate section of the Act, it is the only provision that addresses the collective bargaining rights of noncertified employees, and there is no evidence the legislature would not have passed the Act without it. We conclude it is severable.

In sum, we hold that the Act violates article II, section 37 by adding a provision to chapter 41.56 RCW that renders erroneous existing collective bargaining rights without reference. However, the offending provision is severable, and the remainder of the Act stands.

35

## CONCLUSION

Appellants raise many challenges to the constitutionality of the Act, but we agree with only one. The Act violates article II, section 37 with respect to its revision of chapter 41.56 RCW; however, that provision is severable. Appellants have otherwise failed to carry their heavy burden to show that there is no way the remainder of the Act can be implemented in a manner that is constitutional. Therefore, we affirm the trial court in part, strike the provision that we find unconstitutional, and hold that the remainder of the Act is constitutional on its face.

WE CONCUR:

37

No. 94269-2

GONZÁLEZ, J. (concurring in part and dissenting in part)—I agree with the lead opinion's well-reasoned opinion on all points except one. I cannot join the lead opinion's conclusion that RCW 41.56.0251, as enacted, violates article II, section 37 of our state constitution.

I agree that the critical question is, "Would a straightforward determination of the scope of rights or duties under the existing statutes be rendered erroneous by the new enactment?" *Wash. Educ. Ass'n v. State*, 93 Wn.2d 37, 41, 604 P.2d 950 (1980) (citing *Weyerhaeuser v. King County*, 91 Wn.2d 721, 731, 592 P.2d 1108 (1979)). I also agree that the Public Employees' Collective Bargaining Act, chapter 41.56 RCW, was affected. Under chapter 41.56 RCW, the Public Employment Relations Commission usually decides who is in which bargaining unit. RCW 41.56.060. The charter school act effectively divested the commission of that power as to charter school employees by limiting the bargaining unit to each charter school. LAWS OF 2016, ch. 241, § 137.

But I am not persuaded that a straightforward determination of rights and duties under chapter 41.56 RCW was rendered erroneous by the charter school act. The Public Employment Relations Commission never had authority to determine bargaining units for charter schools because they did not exist. Initiative 1240 both created charter schools and limited charter school employees' ability to organize. LAWS OF 2013, ch. 2 & § 307 (currently codified at RCW 41.56.0251). This was a deliberate policy choice by the drafters. The charter school act reenacted that language without change. LAWS OF 2016, ch. 241, § 137. No charter school employee has been employed in this state or been available to organize without this limitation on the books. This was a policy choice the legislature had the power to make (and, of course, to unmake). I cannot say that "a straightforward determination of the scope of rights or duties under the existing statutes [was] rendered erroneous by the new enactment" when the same act that created the new type of employee also limited their collective bargaining power. *Wash. Educ. Ass'n*, 93 Wn.2d at 41 (citing *Weyerhaeuser*, 91 Wn.2d at 731). Regardless of whether it was a good policy choice, article II, section 37 is not offended.

I agree with the lead opinion that that the legislature would have passed the charter school act without RCW 41.59.031 and RCW 41.56.0251. Thus, I concur with the lead opinion that those provisions are severable.

2

Accordingly, I respectfully concur in part and dissent in part.

González, J.

Fairhurst, C.J.

4

*El Centro de la Raza, et al. v. State, et al.*

No. 94269-2

MADSEN, J. (dissenting)—I agree with Justice Wiggins's dissent that the 2016 charter school act (Act), Laws of 2016, ch. 241, violates article III, section 22 of our state constitution by usurping the constitutional duties of the superintendent of public instruction, and that the offending provisions are not severable, thereby rendering the entire Act unconstitutional. I write separately because, in my view, the Act additionally violates the uniformity requirement contained in article IX, section 2 of our state constitution, as discussed below.

The lead opinion holds that "charter schools are not rendered unconstitutional just because they do not operate identically to common schools." Lead opinion at 16. While I do not disagree with the underlying general principle that all schools need not be identical, in my view, the sweeping exceptions the Act provides for charter schools, coupled with the absence of any direct accountability to the local community that charter schools purport to serve, result in a failing of uniformity that violates article IX, section 2 of our state constitution. Accordingly, I dissent.

The relevant constitutional provision states, "The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may

hereafter be established." WASH. CONST. art. IX, § 2; *see also Sch. Dist. No. 20 v. Bryan*, 51 Wash. 498, 501, 99 P. 28 (1909) (quoting same). In *Bryan*, this court explained that our state constitution "imposed upon the legislature [the duty] of providing a general and uniform system of public schools." *Bryan*, 51 Wash. at 502. Relevant to the context in *Bryan*, this court explained:

> The system must be uniform in that every child shall have the same advantages and be subject to the same discipline as every other child. A system of control through school boards and county superintendents is provided for, their duties defined, and a method supplied to secure, in theory at least, efficient teachers and instructors.

*Id.* at 502-03.

In *Bryan*, the challenged legislation authorized students to be taught at model schools set up in normal (i.e., teachers') schools as an aid for trainee teachers. *Bryan* held in part that the legislation at issue was invalid because "its operation . . . would break the uniformity of the common school system," that is, by having students instructed by uncertified teachers. *Id.* at 504. Although this court's decision in *Bryan* ultimately turned on the improper diversion of common school funds, its discussion of required uniformity concerning the public school system remains relevant.

Here, the "uniform system of public schools" that article IX, section 2 requires is thwarted by the method of governance provided for charter schools by the Act. Under the Act, charter schools are run by an appointed board or nonprofit organization.[1] *See*

---

[1] Such managing entity (i.e., the appointed charter school board or the nonprofit organization hired by the board to manage the charter school) is responsible for functions that would normally be handled by an elected school board, including hiring, managing, and discharging employees;

2

RCW 28A.710.010(1), (5), (6), .030(1)(c). Thus, they are not subject to local voter control and lack any direct accountability to the communities they purport to serve. In *Bryan*, this court acknowledged the importance of local voter control regarding common schools stating:

> [A] common school, within the meaning of our constitution, is one that is common to all children of proper age and capacity, free, and subject to and under the control of the qualified voters of the school district. The complete control of the schools is a most important feature, for it carries with it the right of the voters, through their chosen agents, to select qualified teachers, with powers to discharge them if they are incompetent.

51 Wash. at 504.

Here, charter schools are "[o]pen to all children free of charge" and are required to provide equivalent educational opportunities and advancement as compared to common schools, while utilizing public funds. *See* RCW 28A.710.020(1)(a), .020(2), .040(2)(b); *see also* RCW 28A.710.050(1) (charter schools are "open to any student regardless of his or her location of residence"), .280(1) (state funding for charter schools is to be distributed "equitably"), .020(1)(b) (charter schools are "an alternative to traditional common schools"). But, because charter schools are not subject to local voter control, as are common schools, the different (nonuniform) governance of charter schools runs afoul of the constitutional requirement of a "uniform public school system." Again, while I do not disagree with the lead opinion's general notion that legislatively created non-

---

receiving and disbursing funds; and entering into contracts, among other typical management tasks. *See* RCW 28A.710.030(1).

3

common-schools need not operate identically to common schools in every respect,[2] nevertheless, the private governance and commensurate lack of accountability to local voters regarding charter schools that are open to all students, marks a fundamental and, in my view, dispositive difference between charter schools and common schools sufficient to render the new charter schools outside the uniformity requirement of article IX, section 2.

I acknowledge that in *Bryan* this court was addressing the characteristics for common schools and that we have recently made clear that charter schools are not common schools. *See League of Women Voters of Wash. v. State*, 184 Wn.2d 393, 412, 355 P.3d 1131 (2015). Nevertheless, the Act creates a parallel public school system (i.e., up to 40 schools that are open to all students, RCW 28A.710.150(1)), teaching a general curriculum, using public funds, and lacking direct local voter control. That last attribute renders charter schools at odds with an established core characteristic of our general education public school system—local accountability—and results in nonuniformity. This is so because charter schools, which purport to be open to all students and to provide a general education, are exempt from many of the requirements of our state public school system. The Act provides that charter schools are subject to express charter contract terms and state and federal laws concerning health, safety, parents' rights, civil rights,

---

[2] In stating that "the dissent would hold that all public schools must be *identical* to common schools in order to satisfy uniformity," lead opinion at 15, the lead opinion clearly misreads the dissent.

4

and nondiscrimination; but the Act otherwise provides sweeping exemptions to charter schools, stating,

> For the purpose of allowing flexibility to innovate in areas such as scheduling, personnel, funding, and educational programs to improve student outcomes and academic achievement, charter schools are not subject to, and are exempt from, all other state statutes and rules applicable to school districts and school district boards of directors. Except as provided otherwise by this chapter or a charter contract, charter schools are exempt from all school district policies.

RCW 28A.710.040(3). These exemptions authorize wide variations of personnel management, curriculum, discipline, and academic accountability, both among charter schools and between charter schools and other portions of our general education public school system. This court has repeatedly indicated that under article IX, section 2's uniformity requirement, "every child shall have the same advantages and be subject to the same discipline as every other child." *Bryan*, 51 Wash. at 502; *Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 524, 219 P.3d 941 (2009). The noted exemptions violate that principle, rendering the Act nonuniform.

Further, in light of such sweeping exemptions, local voter control would be essential to ensure that charter schools are held accountable to the people the schools purport to serve. But there is no local control under the Act. Thus, the accountability this court found essential in *Bryan* is absent. *See Bryan*, 51 Wash. at 504 (recognizing the importance of voter control of the schools through their chosen agents).

The lead opinion relies on *Federal Way School District*, in which this court reiterated,

> "A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade—a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education."

167 Wn.2d at 524 (quoting *Northshore Sch. Dist. No. 417 v. Kinnear,* 84 Wn.2d 685, 729, 530 P.2d 178 (1974), *overruled on other grounds by Seattle Sch. Dist. No. 1,* 90 Wn.2d 476, 514, 585 P.2d 71 (1978)).[3] But, in my view, the Act's sweeping exemptions can only frustrate a student's access to standardized educational opportunities and his or her ability to freely transfer to other schools without negative impact.

Further, in the present context, I would add local voter control to the above quoted list of general education public school system uniformity attributes. This court made clear in *Bryan* that local voter control of the school, to ensure accountability to those served by the school, was a hallmark of common schools. In my view, to maintain uniformity within the public school system, a charter school, which is open to all children and offers a general education, must likewise be subject to local voter control. As noted, this court stated in *Bryan,* "Uniform" means that *"every child shall have the same*

---

[3] In *Federal Way School District,* we again addressed a funding issue. The *Northshore School District* decision, from which the *Federal Way School District* decision quoted, also addressed a challenge to the state school system's funding. In *Federal Way School District,* we ultimately rejected the school district's contention that the school funding system, as it concerned staff salaries, violated the uniformity requirement of article IX, section 2. In considering the historical context of article IX, section 2's uniformity provision this court stated in relevant part, "At the time of the constitution and since, . . . local control has been assured through locally elected school board administrators." 167 Wn.2d at 523.

*advantages* and be subject to the same discipline *as every other child.*" *Bryan*, 51 Wash. at 502 (emphasis added). In my view, accountability to those served by a general education school via local voter control is a historically established attribute (i.e., an "advantage" to which all general education students are entitled) that falls within article IX, section 2's uniformity requirement.

I acknowledge that some other legislatively created schools and educational programs are also not subject to local voter control. The parties point to several, such as tribal compact schools.[4] But these programs are distinguishable in that they either serve discrete populations or provide special instruction.[5] *See, e.g., Tunstall v. Bergeson*, 141 Wn.2d 201, 222-23, 5 P.3d 691 (2000) (holding that chapter 28A.193 RCW makes ample provision for educational programs designed to address "the special educational and

---

[4]*See* RCW 28A.715.020(2) (tribal compact schools are "exempt from all state statutes and rules applicable to school districts and school district boards of directors"); *see also* RCW 28A.600.310 ("Running start program" authorizing qualified 11th and 12th grade high school students to take classes offered at higher education institutions), .350 (for both high school and postsecondary credit), .385 (and such program may include participation by nearby Oregon and Idaho community colleges); RCW 28A.185.040 (concerning the University of Washington's early entrance program and transition school for the education of highly capable students below 18 years of age; providing that the transition school is limited to 30 enrollees per year); RCW 28A.193.020 (authorizing superintendent of public instruction to solicit an education provider for the Department of Corrections' (DOC) juvenile inmates); Clerk's Papers at 873 (noting the DOC's operation of a "Youth Offender Program" under contract with Centralia College for the education of juvenile inmates).
[5] *See, e.g.*, RCW 28A.715.030(3) (state-tribal education compact schools "may prioritize the enrollment of tribal members" if the school's capacity is insufficient to enroll all students who apply); *see also* RCW 28A.715.800 (authorizing a pilot project for participating tribal compact schools that provides flexibility to accommodate cultural, fisheries, and agricultural events and practices, and permits replacing statewide student assessments with locally developed, culturally relevant assessments), .810 (exempting student participants in such pilot project from general requirements, such as the obligation to earn a certificate of academic achievement as a prerequisite for graduation from public high school).

rehabilitative needs of children incarcerated in adult prisons"). Further, I agree with the lead opinion that the constitutionality of these special programs and schools is not before the court in this case. *See* lead opinion at 10 n.6. By contrast, charter schools under the Act are required to be open to all children and to provide equivalent education to common schools. This distinguishes them from special and limited educational programs. And, as discussed, in this circumstance the requirements of uniformity, in my view, include accountability through local voter control.[6]

In sum, the Act creates a parallel public school system that provides a general education, serves all students, and uses public funds, but lacks local voter control or oversight. In my view, it therefore violates the uniformity requirement of article IX, section 2.

For the reasons discussed, I dissent.

---

[6] I acknowledge the State's contention that the Spokane School District has authorized two charter schools and that under the Act those schools are "subject to district oversight." Br. of Resp't at 33. However, the Act expressly limits that oversight. RCW 28A.710.180(2) provides, in relevant part, that an authorizer's oversight of a charter school may not "unduly inhibit the autonomy granted to charter schools." In my view, such limited oversight by authorizers is an inadequate substitute for the right of school district voters to exercise "complete control of the schools . . . through their chosen agents," which this court recognized in *Bryan*, 51 Wash. at 504.

8

Madsen, J.

Owens, J.

No. 94269-2

WIGGINS, J. (dissenting)—Suppose our legislature enacted a law providing that for an act of the governor to become effective, the action must be ratified by a commission of 10 appointed officials. There is no doubt such a law would be unconstitutional. But that is the situation we have in the state charter school act—with respect to charter schools, the constitutional responsibility of the superintendent of public instruction to supervise all matters pertaining to public schools has been largely reassigned to the state commission on charter schools, "an independent state agency." RCW 28A.710.070(1). Although the superintendent is a member of the commission on charter schools, the superintendent is 1 member of 11 and does not act alone. *Id.* at (3)(a).

I agree with Justice Madsen's dissent that the charter schools act violates article IX, section 2 of our state constitution. Other than my dissent and Justice Madsen's dissent, I agree with the lead opinion.

## ANALYSIS

Article III, section 22 of the Washington Constitution provides, "The superintendent of public instruction shall have supervision over all matters pertaining to public schools, and shall perform such specific duties as may be prescribed by law." The key term for this case is the word "supervision," and I begin by defining it.

1

I.    Meaning of "Supervision"

*Webster's* defines "supervision" as "the act, process, or occupation of supervising : direction, inspection and critical evaluation : OVERSIGHT, SUPERINTENDENCE." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2296 (2002). To "supervise" means "to coordinate, direct, and inspect continuously and at first hand the accomplishment of : oversee with the powers of direction and decision the implementation of one's own or another's intentions : SUPERINTEND." *Id.*

These words emanate action and authority. One who exercises supervision directs, inspects, and critically evaluates. One who supervises coordinates, directs, and inspects "continuously" in order to oversee the implementation of one's own or another's intentions. As a matter of common sense and normal usage, the meaning of "supervision" is to exercise control over other people in order to further a goal or agenda.

In addition to the dictionary, we have the benefit of the opinion of the Attorney General's Office (AGO), 1961 Op. Att'y Gen. No. 2, interpreting this same section of our state constitution and what it means for the superintendent of public instruction to supervise the public schools. The AGO was asked, "Would a statute providing that the state superintendent of public instruction shall be subordinate to the state board of education and be subject to its direction in matters pertaining to the public schools, be constitutional?" *Id.* at 1. The AGO answered that the constitution "charges the state superintendent in the broadest and most sweeping terms with the duty of supervision 'over *all* matters pertaining to public schools'" and, therefore, the legislature cannot

2

"change or modify the supervision [by the superintendent of public instruction] over all matters relating to the public schools." *Id.* at 2.

The AGO explained more generally that the powers of an officer in an office created by the legislature may be changed by the legislature, "'[b]ut when an office is created by the constitution, it cannot be enlarged or lessened in scope by any statute, or be filled in any other manner than the manner directed by the constitution.'" *Id.* at 2-3 (quoting *People ex rel. Ahern v. Bollam*, 182 Ill. 528, 532, 54 N.E. 1032 (1899)).

In light of these principles, the AGO concluded, "[I]t is the opinion of this office that any legislative enactment which would attempt to make the state superintendent subordinate to the state board of education and subject to its direction in matters pertaining to the public schools would be unconstitutional." *Id.* at 3.

In 1998, the AGO revisited these issues when asked several questions regarding the powers of the superintendent of public instruction, including:

> What grant of authority and responsibility is given to the Superintendent of Public Instruction by the term "supervision" under this section? Does the term "supervision" place limits on the authority of the Superintendent of Public Instruction?"

1998 Op. Att'y Gen. No. 6, at 2.

The AGO distilled several principles from its review of the relevant authorities, most relevant for this opinion that article III, section 22 imposes a limitation on the legislature's power to infringe on the superintendent's powers of supervision. AGO opinion no. 6 suggests this test for the constitutional limits on infringing on the superintendent's powers:

> If the proposal subordinates the Superintendent to some other officer or body (as discussed in AGO 1961-62 No. 2) or shifts so many

3

responsibilities to other officers or agencies that the Superintendent no longer "supervises" the public school system, the proposal is probably unconstitutional. Otherwise, the Legislature is free to assign specific roles as it thinks best.

*Id.* at 4.

The AGO opinions expand on our understanding of the meaning of "supervision" by adding these additional indicia of an unconstitutional infringement on the powers of the superintendent: an attempt to make the superintendent subordinate to another entity, such as the state board of education, or shifting the supervision of elements of the public school system out of the responsibilities of the superintendent.

In addition to dictionary definitions and AGO opinions, at least one of our cases speaks to the importance of supervision. *Great N. Ry. Co. v. Snohomish County*, 48 Wash. 478, 484, 93 P. 924 (1908). *Great Northern* challenged the assessment of railroad property by the county assessor and state board of tax commissioners, arguing for a lower assessment by the state board. *Id.* at 479-80. The state board was given "general supervision" over county assessors and county boards of equalization. The county argued that the state board's general supervision over local assessors and boards gave the state board only the power to confer and advise, issuing only advisory opinions. *Id.* at 484. We unequivocally rejected the county's argument: "We cannot believe that the legislature went through the idle formality of creating a board thus impotent." *Id.* We approved *Webster's* definition of "supervision" as "overseeing; inspection; superintendence." *Id.* at 485. Consistent with the language of our constitution, dictionary definitions, and AGO opinions, our *Great Northern* decision emphasizes the active role of one who supervises, including oversight and correction of the supervised entity.

4

II.    "Supervision" by the Superintendent of Public Instruction

I turn now to determining whether the charter school act unconstitutionally infringes on the superintendent's power of supervision. Article III, section 22 of the constitution broadly grants supervisory power to the superintendent: "The superintendent of public instruction shall have supervision over all matters pertaining to public schools."

This expansive language gives to the superintendent the power of oversight, inspection, and correction, as well as all other functions inherent in supervision, of all public schools. Charter schools are, of course, public schools. RCW 28A.710.010(5). The issue for us to decide is whether the charter school act gives the superintendent of public instruction supervision over charter schools. The answer is that with respect to charter schools, the superintendent has only supervisory power shared with 10 other members of the charter school commission. The constitutional grant of supervision to the superintendent calls for 1 individual to exercise supervision, not a group in which the superintendent holds less than 10 percent of the vote.

Chapter 28A.710 RCW establishes the Washington State Charter School Commission, which is by definition "an independent state agency." RCW 28A.710.070(1). Of the 11 members of the commission, 9 are appointed, some by legislators and others by the governor, the chair of the state board of education, and the superintendent of public instruction. RCW 28A.710.070(3). One of the powers of this charter school commission is to exercise "supervision" over the charter schools: "The commission shall, through its management, *supervision*, and enforcement of the charter contracts and pursuant to applicable law, administer the charter schools it

5

authorizes in the same manner as a school district board of directors administers other schools." RCW 28A.710.070(2) (emphasis added). In short, the charter school act creates "an independent state agency" to which it delegates the power of supervision of the charter schools, which unconstitutionally reduces the control of the superintendent of public instruction from 100 percent strength conferred by the constitution to a mere 9 percent share devised by legislative mandate, i.e., 1 vote out of 11.

The constitutional violation embodied within the charter school act becomes even clearer upon a review of the act. The act is built around the powers given to "authorizers," which can authorize the creation and supervision of a charter school. RCW 28A.710.010(3). The act defines two entities that can authorize and operate charter schools: the charter school commission and a school district board of directors wanting to include charter schools within the district. *Id.*; RCW 28A.710.080. Authorizers have the power to "oversee the charter schools the entity has authorized." RCW 28A.710.010(3). No authority is given to the superintendent to exercise any oversight of the authorizer, which in the case of the charter school commission is "an independent state agency." RCW 28A.710.070(1). Thus, because there is no authority given to the superintendent to oversee the independent authorizers, the act deprives the superintendent of the constitutional power to superintend.

Repeatedly, the charter school act gives powers to the charter school commission and school district authorizers without giving any oversight to the superintendent. Some of the powers are as follows.

6

Charter school authorizers must file an annual report describing a number of subjects, including "[o]ngoing charter school oversight and evaluation." RCW 28A.710.100(3)(d). No authority is given to the superintendent to exercise his or her constitutional power of supervision.

The State Board of Education is responsible for "overseeing" the performance of school districts that are authorizers of charter schools. RCW 28A.710.120. The charter school act provides for imposition of sanctions and conditions on a poorly performing authorizer, but there is no role for the superintendent in this process. *See id.* Similarly, authorizers have the power to "continually monitor the performance and legal compliance" of the charter schools they have authorized. RCW 28A.710.180(1). "An authorizer may conduct or require oversight activities that enable the authorizer to fulfill its responsibilities under this chapter, including conducting appropriate inquiries and investigations." *Id.* at (2). There is no role for the superintendent in this process.

Applications to become a charter school must be submitted to and approved by an authorizer in accordance with statutory requirements. RCW 28A.710.140. The charter school act makes no provision for the superintendent to supervise the application process.

An authorizer can terminate the contract of a charter school that fails to perform appropriately. RCW 28A.710.200. Once again, it is the authorizer that makes this decision and acts on it.

To recapitulate, the supervision of one particular kind of public school—the charter school—has been reassigned by the charter school act to the state charter

7

school commission. The superintendent of public instruction is not a part of the supervision process, which is largely delegated to "authorizers." Nor can the superintendent supervise the charter school commission—of which the superintendent is 1 vote out of 11—because the Washington State Charter School Commission is "an independent state agency" and therefore not subject to the authority of the superintendent of public instruction. In *Webster's* words, the superintendent has lost the ability to "oversee with the powers of direction and decision the implementation of [the superintendent]'s intentions."

To summarize, the charter school act has given the authorizers of charter schools the following powers, among others: to "oversee" schools they charter, to report annually on their "oversight" of the schools they charter, to continually monitor the performance of their chartered schools, to review and act on applications from entities wanting to open a charter school, and to terminate schools that fail to perform. In the words of the AGO's 1998 opinion no. 6, the charter school act "shifts so many responsibilities to other officers or agencies that the Superintendent no longer 'supervises' the public school system," and this shift of power from the officer clothed with the constitutional power to supervise all aspects of the public schools is unconstitutional. 1998 Op. Att'y Gen. No. 6, at 4.

The lead opinion points to language in the charter school act that seems to the lead opinion to preserve the superintendent's power to supervise the charter schools: "'Charter schools are subject to the supervision of the superintendent of public instruction and the state board of education, including accountability measures, to the same extent as other public schools, except as otherwise provided in this chapter.'"

8

Lead opinion at 22 (quoting RCW 28A.710.040(5)). What the legislature has given to the superintendent in the first 30 words of this statute, the legislature has taken back in the final 7 words: "except as otherwise provided in this chapter." As discussed above, what is "otherwise provided in this chapter" is that the charter school commission, not the superintendent, is given the power of supervision of the charter schools while section after section of the act gives powers of oversight and supervision to the commission. Where the lead opinion sees "nothing in chapter 28A.710 RCW that qualifies or diminishes the superintendent's powers," *id.*, I see sections that bestow on the commission the powers constitutionally given to the superintendent.

The lead opinion fails to offer any interpretation that might conceivably make the charter schools act consistent with our constitution. The Washington Constitution gives to the superintendent "supervision over all matters pertaining to public schools . . . ." CONST. art. III, § 22. The legislature has given to the charter school commission the power to exercise "supervision" of the charter schools, which are public schools. RCW 28A.710.070(2). The charter school commission is "an independent state agency." RCW 28A.710.070(1). This is an inherent conflict. The superintendent cannot supervise an independent agency. The constitution provides the key to resolving this deadlock: the power of supervision ultimately lies with the superintendent, not with the commission.

The lead opinion attempts to justify this shift of the power of supervision by pointing to language in the charter school act that makes charter schools "subject to the supervision of the superintendent." RCW 28A.710.040(5). But this apparent grant

9

of power to the superintendent is immediately qualified by the clause "except as otherwise provided in this chapter." *Id.*

The lead opinion attempts to trivialize the fact that the charter school act gives powers to the charter school commission and school district authorizers without giving any oversight of these powers to the superintendent. Lead opinion at 23-24. But the lead opinion cannot escape the fact that the act specifically gives these powers to the commission without clarifying that the superintendent also retains these powers. The lead opinion fails to read the act as a whole. And as noted immediately above, the act declares that the superintendent retains the power of supervision, "except as otherwise provided in this chapter." RCW 28A.710.040(5). The delegation of specific powers to the commission denies the powers to the superintendent.

The issue before us is a specific application of an undisputed principle of constitutional law—powers that the constitution has given to a specific government official cannot be taken and bestowed on another government actor. Or, as was stated by a respected and influential judge and professor within a few years of our constitutional convention of 1889, "[S]uch powers as are specially conferred by the constitution upon the governor, or upon any specified officer, the legislature cannot require or authorize to be performed by any other officer or authority; and from those duties which the constitution requires of him he cannot be excused by law." THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 135-36 (5th ed. 1998) (1883). The issue is whether the constitution has conferred on the official a power that the legislature has later tried to affix to a different official. That is exactly what we have

10

in this case. The fact that the superintendent may be left with other duties, see lead opinion at 20-24, does not rectify taking from the superintendent the one duty expressly mentioned in the constitution: supervision over "all matters pertaining to public schools."

As a result, the charter school act is unconstitutional. Before I turn to the consequence of the constitutional violation, I note that two sister states have held that statutes similarly infringed on similar language in their constitutions. *Thompson v. Craney*, 199 Wis. 2d 674, 699, 546 N.W.2d 123 (1996); *Powers v. State*, 2014 WY 15, 318 P.3d 300, 302. The constitutional provisions establishing the office of superintendent of public instruction in both constitutions are similar to Washington's, and the Supreme Courts of both states held that statutes infringing on the power of supervision were unconstitutional.

The Wisconsin Constitution provides, "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law." WIS. CONST. art. X, § 1. The Wisconsin Supreme Court held that the original intent of the drafters was that the general supervision over the state education system was within the responsibility and authority of the superintendent. *Thompson*, 199 Wis. 2d at 685.

Wyoming's constitution provides, "The general supervision of the public schools shall be entrusted to the state superintendent of public instruction [(SPI)], whose powers and duties shall be prescribed by law." WYO. CONST. art. VII, § 14. The Supreme Court of Wyoming held that although the legislature could alter the powers

and duties of the SPI, it could not deprive the SPI of its constitutionally vested power of "general supervision of the public schools." *Powers*, 318 P.3d at 323.

### III. Constitutionality of the Remaining Sections of the Act

When the court declares a part of a legislative act to be unconstitutional, the remaining provisions of the act are not necessarily unconstitutional; the question is whether the remaining provisions are severable from the unconstitutional provisions. *League of Women Voters of Wash. v. State*, 184 Wn.2d 393, 411, 355 P.3d 1131 (2015). "The test for severability is whether the unconstitutional provisions are so connected to the remaining provisions that it cannot be reasonably believed that the legislative body would have passed the remainder of the act's provisions without the invalid portions, or unless elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes." *Id.* at 411-12.

The charter school act includes a severability clause: "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." ENGROSSED SECOND SUBSTITUTE S.B. 6194, § 305, 64th Leg., Reg. Sess. (Wash. 2016). A severability clause indicates that the legislature would have passed the statute without the severed language, but it is not dispositive. The court must still evaluate whether the act would have been passed even without unconstitutional provisions.

The critical language for our purposes includes both the acknowledgement in the act that the superintendent of public instruction's power of supervision was being reduced—charter schools are subject to the superintendent's supervision "except as

12

otherwise provided in this chapter," RCW 28A.710.040(5)—as well as the provisions allocating to the charter school commission powers of supervision without the superintendent's oversight or participation. As discussed above, the act includes the creation of the charter school commission as "an independent state agency" responsible for "oversight," "management," "supervision," and administration of the new charter schools, RCW 28A.710.070(1)-(2). The "independen[ce]" of the commission is reinforced by the requirement that all appointed members of the commission "shall have demonstrated an understanding of and commitment to charter schooling as a strategy for strengthening public education." RCW 28A.710.070(4).

The charter school act confers other powers on the commission that conflict with the constitutional grant of these powers to the superintendent. As an "authorizer" of charter schools, the commission has the power to create and supervise charter schools, to report on its "oversight and evaluation" of the charter schools it authorized (RCW 28A.710.010(3), .100(3)(d)); to continually monitor the charter schools it has authorized (RCW 28A.710.180); to authorize the applications to become a charter school (RCW 28A.710.140); and to terminate the contract of a charter school it has authorized (RCW 28A.710.200).

The specificity of the act's allocation to a new commission of key responsibilities in supervising the charter schools weighs against the conclusion that the act would have been passed without the powers granted to the commission—powers that the constitution confers on the superintendent.

On a more practical level, what statutory language would the court change in the charter school act to make the act constitutional? One possibility would be to strike

13

from RCW 28A.710.040(5) the language "except as otherwise provided in this chapter," leaving the subsection to read, "Charter schools are subject to the supervision of the superintendent of public instruction and the state board of education, including accountability measures." How would that change affect the remaining allocations of supervisory power over charter schools? Would the commission continue to be solely responsible for creation, supervision, and termination of the charter schools it authorizes? Similar questions abound. In short, severing the offending language from the charter school act would leave the act incomplete and unworkable without further legislative direction.

The unconstitutional delegation of supervisory powers to the charter school commission cannot be segregated from the constitutional provisions. I would hold that the act is unconstitutional and therefore respectfully dissent.

15